## MATTIE B. MOSHER, Appellant, v. ERNEST BACON.

**In Banc, June 21, 1910.**

1. **SWAMP LANDS: Purchase Price Paid: Subsequent Sale: Change of County Lines.** Where the swamp land was purchased and paid for in 1858, and these facts were entered of record in the offices of the register of lands and of the receiver of the county, and thereafter the lands, by act of the Legislature changing county lines, were placed in another county, that county, though no patent had ever been issued by the State to the purchaser, thereafter had no authority or right to sell the land, and if it did so the grantee in the commissioner's deed acquired no title as against one who through mesne conveyances acquired the equitable title of the first purchaser. It was no fault of the first purchaser from the county that when he purchased and paid for the land, no patent was issued to him by the officers upon whom the law placed that duty.

2. ————: ————: ————: ————: **Notice.** Title to swamp lands in the beginning was in the United States, and by Act of Congress passed to the State, and by Act of the General Assembly in 1853 passed to the several counties in which they were situated—that is, though the State still retained the title, yet it constituted the counties its authorized agents to sell the lands on the terms and in the manner prescribed by law, the patent to be issued by the State pursuant to a sale by the county in accordance with those prescriptions. All these public. laws the purchaser was bound to take notice of, and he was bound to know what the books and files in the public offices of the county where the sales were made would show, for the officers of the county entrusted with making the sales were required by law to keep a record of their acts. The purchaser was also charged with notice of the fact that the land he was about to purchase was in 1858 in Ripley county, that it was, by a legislative act of 1864, changing the boundaries of the county, placed in Butler county, and that the records of Ripley county, the books and files in the offices of the register of lands and receiver of Ripley county, would show what if anything Ripley county had done in the way of selling the lands prior to 1864; and if an examination of those books and files would have revealed the fact that the land had been sold in 1858 to a purchaser who paid for it in full, he was charged with notice of

all these matters when he bought from Butler county in 1902, and that Butler county had no authority to again sell the lands, though no patent had ever been issued to the original purchaser.

3. ———: ———: **County's Power to Resell.** A purchaser who has complied with all the statutory requirements necessary to entitle him to a patent from the State in a particular tract of swamp land, is to be regarded thereafter as the equitable owner, and when the records of the county in which the lands were situated when he purchased show that he paid in full for the land and was entitled to a patent, the county thereafter has no power or right to sell the land to another; and the lack of authority in the county to again sell is not supplied by the fact that the State failed to issue to him the patent to which he was entitled. Neither the State nor the county has any authority to sell again a tract of land which has already been sold in pursuance to statutory authorization.

4. ———: **Patent: Record.** The law requires a patent to swamp land issued by the State to be recorded in the office of the Secretary of State, but it does not require it to be recorded in the office of the county recorder, though that may be done for the purpose of showing a perfect chain of title.

Appeal from Butler Circuit Court.—*Hon. J. C. Sheppard,* Judge.

REVERSED AND REMANDED (*with directions*).

*John M. Atkinson* for appellant.

(1) The land in suit was placed on the market as public land. York having bought and paid for same in full, and having fully complied with all the requisites necessary to entitle him to a patent from the State, became the equitable owner, and any subsequent grant of the same land by Ripley county or Butler county after the change of county boundary, was absolutely void, unless the sale to said York had first been vacated or set aside. The proof shows that the sale to York was never vacated or set aside, and no ground for it ever existed. By an act of the Legislature, Laws 1852, p. 108, all of the swamp lands then located in

Ripley, Butler and certain other named counties were donated to the counties in which such lands were located. The sale of said land was to be governed by the general act donating swamp lands to certain named counties. Laws 1850-1, p. 238. An act was passed by the Legislature, further regulating the sale of the swamp lands in Ripley, Butler and certain other counties therein named. Laws 1854-5, p. 154. The proof in this case shows that York fully complied with all of the provisions of said act; that he paid for the land in full, and that the sale to him was duly entered of record in book 2 of the register of swamp lands sold at private sale in Ripley county. Nothing further remained for York to do on his part, and it then became the duty of said register and receiver to certify the purchase of and full payment for said land to the State register of lands, whose duty it was then to issue a patent to York. This the State failed to do, and for such failure a penalty was assessed against appellant, who is an innocent purchaser, by the court below, saying that she must lose her land by reason of the failure of the State officers to do their duty. Wickersham v. Woodbeck, 57 Mo. 61; Johnson v. Fluetsch, 176 Mo. 470; Wirth v. Branson, 98 U.S. 121. The appellant in this case stands in the same position that York would occupy had he not parted with his equitable title on the day following his purchase from Ripley county. Nor did Butler county have any more right to sell the land the second time than Ripley county would have had if the boundary line had not been changed and the land had remained in Ripley county. (2) The court erred in not giving declaration of law number 3 as requested by appellant. The proof shows that respondent had actual knowledge of all the deeds offered in evidence by appellant. His contract with Butler county stated that he had compared the lands with his abstracts, and hence he must have known of each deed from York to appellant. Furthermore, it is not denied

that the witness Miss Marley, who was respondent's agent in investigating the title as an abstractor, had actual knowledge of each transfer of the land from York to appellant. She knew that each deed had been recorded in Butler county and that two or three of them had been recorded in Ripley county. Actual notice to respondent's agent, Marley, was actual notice to respondent himself. Hedrick v. Beeler, 110 Mo. 100; Meier v. Blume, 80 Mo. 183; Hickman v. Green, 123 Mo. 165; Bank v. Phillips, 22 Mo. 89; O'Neill v. Blare, 94 Mo. App. 648; Bobbitt v. Kelley, 96 Mo. App. 529; 21 Cyc. 1587. Respondent had actual notice of the tax sale of the land as the property of Peter M. Brown and the resale of the same by Davidson to the Brown heirs. Respondent knew that the land had once been located in Ripley county. He had actual notice that the first deeds conveying it were made and recorded in Ripley county where the land was first located. Respondent testified that he did, after the purchase of the land from Butler county, look up the title in the Ripley county records. If respondent had sufficient notice to look up the title after the purchase from Butler county, he certainly had sufficient notice before the purchase to put a prudent man on inquiry. Zweigert v. Reed, 221 Mo. 33; Ins. Co. v. Smith, 117 Mo. 292; Hedrick v. Beeler, 110 Mo. 98; Mason v. Black, 87 Mo. 342; Sensenderfer v. Kemp, 83 Mo. 588; Meier v. Blume, 80 Mo. 184; Phillips v. Trust Company, 214 Mo. 682.

*James F. Green* and *Ernest A. Green* for respondent.

(1) The court did not err in refusing to give plaintiff's declaration of law number 1, in the nature of a peremptory instruction to find for the plaintiff. Under the law and all the evidence in the case, the judgment was properly rendered for the defendant. Wilcox v. Phillips, 199 Mo. 288; Wickersham v. Woodbeck, 57

Mo. 59; Johnson v. Fluetsch, 176 Mo. 452; Phillips v. Trust Co., 214 Mo. 669; Wirth v. Branson, 98 U. S. 121. (2) The court properly refused to give plaintiff's declaration of law number two. First: There was no testimony showing that the land in controversy was ever located in Ripley county; second, defendant had no notice either actual or constructive of the sale by Ripley county to York, and therefore that sale was inoperative to convey any title to York or his grantees as against defendant. Laws 1852, p. 108; Laws 1850-51, p. 238; Laws 1854-55, p. 154; Laws 1863-64, p. 409; Phillips v. Trust Co., 214 Mo. 669; Wilcox v. Phillips, 199 Mo. 288; Delassus v. Winn, 174 Mo. 636; Morrison v. Juden, 145 Mo. 282; Elliott v. Buffington, 149 Mo. 663; Kelley v. Vandiver, 75 Mo. App. 435. (3) Plaintiff's declaration of law number three was rightly refused by the trial court. Defendant was bound to take notice of only such deeds as appeared of record, and they showed the title to be vested in Butler county at the time of defendant's purchase therefrom. Geer v. Lumber & Mining Co., 134 Mo. 85; Railroad v. View, 156 Mo. 608; Becker v. Stroeher, 167 Mo. 306; Jurden, v. Ming, 98 Mo. App. 205; Evarts v. Lumber & Mining Co., 193 Mo. 433; Lucas v. Land & Cattle Co., 186 Mo. 448; Zweigert v. Reed, 221 Mo. 33; Phillips v. Trust Co., 214 Mo. 669; Hedrick v. Beeler, 110 Mo. 91; Insurance Co. v. Smith, 117 Mo. 261. (4) Plaintiff's declaration of law number four was properly refused by the trial court; equitable estoppel does not lie against a county. Phillips v. Butler County, 187 Mo. 698; Heidelberg v. St. Francois County, 100 Mo. 69.

WOODSON, J.—The facts of this case are few, and in so far as they are material, as I view it, are undisputed. They are as follows, as stated by counsel for appellant:

"This suit is brought under section 650, to quiet title to the south half of lot number 1 of the southwest

quarter (sometimes described as SE. ¼ of SW. ¼) of section 7, township 22 north, of range 5 east, Butler county, and containing 40 acres.

"The petition further pleaded actual notice of appellant's adverse claim of ownership by respondent at the time he obtained a commissioner's deed from Butler county to the land involved in suit, and also equitable estoppel.

"The answer set up claim of ownership in respondent, and further a general denial.

"The land in suit is what is known as "Swamp Land," and was donated to the State of Missouri by an act of Congress, dated September 28, 1850.

"The land in suit is located on the east side of what is known as Little Black River, and was, prior to January 21, 1864, located in Ripley county. Since said date the land has been located in Butler county.

"On October 14, 1858, the land in suit, together with other lands, was sold to one George W. York by the register of lands of Ripley county; said York paid for said land in full on said date and received a certificate of purchase from said register, and also a receipt from the receiver of said county showing full and complete payment for the same.

"An entry in the Ripley county register of lands sold at private sale, kept by the county clerk of said county, who, by law, was made *ex officio* register of the swamp lands of said county, was duly entered, showing said sale to said York, and the full payment of same.

"On October 15, 1858, said York sold and conveyed by general warranty deed the land in suit and certain other lands to one Peter M. Brown, and said deed was duly filed and recorded in the deed records of Ripley county.

"On February 21, 1878, a certified copy of said deed from said York to said Brown was duly filed and recorded in the deed records of Butler county.

"Said Brown died seized of the land in suit, together with other lands located in both Butler and Ripley counties, leaving surviving him James S. Brown and Francis H. Brown.

"The testimony shows that said Francis H. Brown thereafter died, and his interest in said lands descended to his brother, said James S. Brown. Said James S. Brown thereafter sold and conveyed the land in suit, together with other lands, to the appellant, Mattie B. Mosher, Fannie C. Jerome and Dorris Brown; that thereafter said Fannie C. Jerome and Dorris Brown sold and conveyed their interest in the land in suit to appellant.

"All of the various named deeds of conveyance were, soon after the making of the same, duly recorded in the deed records of Butler county.

"On November 17, 1888, the land in suit was sold to one I. M. Davidson by Butler county, for taxes for the year 1883. Soon thereafter said Davidson sold and conveyed all of his title under the sheriff's deed to said James S. and Francis Brown, heirs of said Peter M. Brown, deceased. The sheriff's deed to said Davidson and the deed from said Davison to the said Browns were duly recorded in the deed records of Butler county.

"The respondent Bacon claims title to the land in suit through purchase and sale from Butler county, dated January 23, 1902, he having received a commissioner's deed from the county.

"The proof shows that respondent at the date of the pretended purchase of the land in suit from Butler county, was engaged in the business of buying and selling real estate in Butler county, and was the owner of a set of abstract books to all the lands in said county.

"The trial court held that the Swamp Land record of sales kept by the county clerk, who was *ex officio* register of lands of Ripley county, at the date of

the sale to said York, did not impart notice to respondent of the sale of the land in suit to said York, and further, that actual notice of all of the recorded deeds and sheriff's sale of Butler county, was not notice to respondent of appellant's equitable claim of ownership, and, therefore, gave a decree in favor of respondent.

"Appellant requested four declarations of law, all of which the court refused to give, and which are set out in full in appellant's abstract of record.

"In respondent's contract with Butler county for the purchase of the land in suit, together with many other tracts, it is provided that in case the title to any land sold respondent fails, the county is to refund the purchase price to respondent.

"The court entered its decree in favor of appellant, and after an unsuccessful motion for a new trial, appellant brings the cause to this court for review, having fully complied with all conventional requirements to entitle her to same."

I.   Briefly stated, this land, with vast other bodies of swamp lands, was donated to the State of Missouri by an act of Congress, approved September 28, 1850. At that time, and down to the 21st day of January, 1864, the land in controversy was located in Ripley county.

On February 23, 1853, by an act of the Legislature, all the swamp lands located in Ripley, Butler and other counties named therein were donated to the counties in which they were located. [Laws 1852-3, p. 108.]

On October 14, 1858, Ripley county, in pursuance to an act of the Legislature, approved March 1, 1855 (Laws 1854-55, p. 154), regularly sold, at private sale, the land in suit to one George W. York. Said York paid for the land, and on the same day received a certificate of purchase from the register of swamp lands of said county, and also a receipt from the receiver of public moneys of said county, showing full pay-

ment of the purchase price. The register of swamp lands duly entered the sale of this land to York in record book two of his office.

By an act of the Legislature, approved January 21, 1864, the boundary line between Butler and Ripley counties was so changed as to place the land in controversy in Butler county.

On October 15, 1858, York, without procuring a patent therefor, sold said land to Peter M. Brown, and by mesne conveyances appellant acquired and is now the owner of the interest purchased by York from Ripley county.

The respondent claims title to the same land through a purchase made by him from Butler county, dated January 23, 1902; he received a commissioner's deed therefor from said county.

The first section of the Act of February 23, 1853, donating these swamp lands to the various counties, reads as follows:

"Section 1. That all swamp lands, lying in the counties of Scott, New Madrid, Pemiscot, Mississippi, Cape Girardeau, Stoddard, Dunklin, Ripley, Butler and Wayne, are hereby donated to the counties in which they lie, upon the terms and provisions of the act entitled 'An act donating certain swamp and overflowed lands to the counties in which they lie,' approved March 3, 1851; provided, that the amount appropriated for the reclamation of said overflowed and swamp lands, in the counties specified in this section, be refunded to the State."

Section 1 of said act of March 1, 1855, made the county clerk of each named county *ex officio* register of the swamp lands in his county.

Section 2 made the county treasurer of each county named *ex officio* receiver of public moneys received from the sale of swamp lands in his county.

Further pertinent provisions of said act are as follows:

"Section 4. When any of said lands shall be sold in any of the modes pointed out in this act, the register shall make triplicate certificates of the fact, describing the land so sold by its numbers and quantity, to whom sold, and the amount of the purchase money per acre, and in the aggregate—one of which certificates he shall deliver to the purchaser, file one in his office, and transmit the other to the register of lands at Jefferson City, with an abstract containing the number of the certificate, the name of the purchaser, the number of the land, and the amount of purchase money.

"Section 5. When a certificate of purchase shall be presented to the receiver of public moneys, and the money paid, he shall issue triplicate receipts to the purchaser, stating the numbers and quantity of the land, the name of the purchaser, and the amount paid per acre, and in the aggregate—one of which receipts shall be delivered to the purchaser, one filed in his office, and the other transmitted to the register of lands at Jefferson City, with such an abstract as is required to be transmitted by the register in the next preceding section. . . .

"Sec. 13. The county courts of the several counties in this act named, have power to fix the times of the sales of the land in their respective counties—and when they shall have fixed the time of sale, they shall direct the following things to be done:

"1st. Their clerk shall enter upon the record the day and date of the sale.

"2nd. Such sale shall be at the courthouse door of their county, between the hours of nine o'clock in the forenoon and five o'clock in the afternoon of the same day.

"3rd. The county courts of the several counties in this act named, except as hereinafter excepted, shall direct their sheriff to give at least ninety days' notice of the time and place of the sale, and the lands to be sold—such notice to be put up in three of the most

public places in the several townships in their several counties, and published in at least two of the most contiguous newspapers, once a week, for at least eight weeks before the day of sale. . . . .

"Sec. 15. When the lands are offered for sale, the register shall conduct the same, offer all lands for sale within his county—surveyed and platted in his office, either by the surveyors of the United States, or the surveyors appointed by the authorities of this State, and the consequence shall be as follows:

"1st. The highest bidder at the public auction shall be the purchaser.

"2nd. Such lands as shall remain unsold at the auction sale, shall be subject to private entry with the register and receiver.

"Sec. 37. The register of lands, at Jefferson City, on the receipt of any certificate in this act specified, shall make out, in the name of the State, patents for the lands in such certificate mentioned, in the same manner as other patents, and under the same rules."

The evidence shows, and it is undisputed, that York purchased this land, paid the full purchase price therefor to Ripley county, and complied fully with all the provisions of this act authorizing the sale of swamp lands. The evidence is equally conclusive that this sale was duly recorded in book two of the register of swamp lands on October 14, 1859, long prior to the date when the boundary line between Butler and Ripley counties was changed.

By the Act of 1855, upon the receipt of the purchase money for this land, it was made the duty of the register of swamp lands and the receiver of public moneys of Ripley county to certify York's purchase to the State Register of Lands at Jefferson City, whose duty it was to issue a patent to York. The latter was not culpable in the premises. The negligence rested with the county and State officials in not issuing a patent to York.

Upon that state of facts is predicated the legal proposition, who holds the better title to this land—Mosher, the appellant, or Bacon, the respondent?

There can be no question, according to the repeated rulings of this court, and that of the Supreme Court of the United States, but what Mosher acquired the equitable title to the land in controversy by purchasing the same of the register of swamp lands of Ripley county, and by paying the purchase price thereof to the receiver of public moneys of that county.

In Wickersham v. Woodbeck, 57 Mo. l. c. 61, Judge NAPTON, in speaking for this court, said: "Our statute recognizes receiver's receipts as a title sufficient to sustain an ejectment against any one not having a better title; and their admissibility is beyond dispute. Their duplicate receipts are the only evidences of title which the purchaser from the State can receive on his application to buy. The purchaser has no control over the land officers, or their acts subsequent to an entry. The government appoints them and if they are false to their trust, it is abhorrent to every principle of justice that those who deal with them should suffer by their failure to comply with their duty. The register's and receiver's receipt is evidence that the State has passed the title, although the formality of a patent is wanting. The equitable title is at least passed, for the purchase money is paid, and the State cannot transfer her title, which is a mere naked legal title, to another."

And in Johnson v. Fluetsch, 176 Mo. l. c. 470, an act of Congress, the provisions of which were very similar to those contained in said act of March 1, 1855, was under consideration; and in discussing said act of Congress, Judge GANTT, in speaking for this court, said: "When John F. Stephan located his warrant and received his certificate of entry and purchase, he was required by law to deliver up his warrant to the register of the land office at St. Louis, and this the

evidence shows he did. He could not control the officers of the land office, neither is he responsible for their neglect of duty in failing to report his location to the general land office at Washington City. The equitable title of the United States passed to the defendant's remote grantor, Stephan, and the government had no right to patent it to plaintiff. The right to patent, once vested as respects the government, is equivalent to a patent. [Wickersham v. Woodbeck, 57 Mo. 59; Wirth v. Branson, 98 U. S. 118; Stark v. Starrs, 73 U. S. 402.] While the State has no right to control the primary disposition of the public lands belonging to the United States, yet when the title passes from the government, the State courts have jurisdiction to determine the controversy between the adverse claimants thereto. [Magwire v. Tyler, 40 Mo. 406; Hedrick v. Beeler, 110 Mo. 91; Carman v. Johnson, 20 Mo. 108.]''

It will be observed from reading this language of Judge Gantt, that the court held that the sale by the register of lands not only conveyed the equitable title of the United States to the purchaser, but also that the Government had *no right to patent it to the plaintiff*. The same is true in the case at bar. When York purchased the land in controversy from the register of swamp lands of Ripley county, and paid the full purchase money therefor to the receiver of public moneys of said county, and took his receipt therefor, he, in almost the language of Judge Gantt, could not control the officers of the land office, neither was he responsible for their neglect of duty in failing to report his purchase to the State Register of Public Lands at Jefferson City. The equitable title, as before stated, passed to York, and by mesne conveyances to Mosher, the appellant; and neither the State nor Butler county had any right to patent it to Bacon, the respondent, or to anyone else, except to York or his remote grantee. And in support of the above conclusion, Judge Gantt

cited and relied upon the case of Wickersham v. Wood-beck, supra, wherein Judge NAPTON construed the act now in question.

In the case of Wirth v. Branson, 98 U. S. 1. c. 120, Mr. Justice BRADLEY, while considering this same act of Congress, in speaking for the Supreme Court of the United States, said:

"Upon this evidence, each party asked the court for instructions; and the instructions given were, first, that the defendants had proved that the land in controversy was granted by the United States to Giles Egerton on the 10th of January, 1818, and that Egerton had conveyed it to Thomas Hart, which constituted an outstanding title that defeated the plaintiff's right of recovery; second, that defendants had shown that on the 10th of January, 1818, the land warrant of Giles Egerton was duly located on and upon the land in controversy, which location was not shown to be vacated or set aside, and therefore said land was not subject to entry by or grant to Leonard in 1868; and a verdict was thereupon given for the defendants. To these instructions the plaintiff excepted; and whether they were correct is the question now before the court.

"Each of these instructions was based upon undisputed facts; and if either was correct in point of law, the defendants had a complete defense, and the judgment must be affirmed.

"We are satisfied that the second instruction, at least, correctly expressed the law of the case, and renders the production of the original patent to Egerton entirely immaterial. The land in question was shown to have been located in his favor in due form, under a regular military land warrant, and no attempt was made to show that this location was ever vacated or set aside. Whilst it was in force, no other could lawfully be made on the same land. A subsequent location, though followed by a patent, would be void. Everything was done which was required to be done

to entitle Egerton to a patent for the land.  Being for military bounty, no price was payable therefor.  The land became segregated from the public domain, and subject to private ownership, and all the incidents and liabilities thereof.

"The rule is well · settled, by a long course of decisions, that when public lands have been surveyed and placed in the market, or otherwise opened to private acquisition, a person who complies with all the requisites necessary to entitle him to a patent in a particular lot or tract is to be regarded as the equitable owner thereof, and the land is no longer open to location.  The public faith has become pledged to him, and any subsequent grant of the same land to another party is void, unless the first location or entry be vacated and set aside.

"This was laid down as a principle in the case of Lytle v. The State of Arkansas, 9 How. 314, and has ever since been adhered to.  See Stark v. Starrs, 6 Wall. 402.  Subsequent cases which have seemed to be in conflict with these have been distinguished from them by the fact that something remained to be done by the claimant to entitle him to a patent, such as the payment of the price, the payment of the fees of surveying, or the like.  The proper distinctions on the subject are so fully stated in the case of Stark v. Starrs, supra; Frisbie v. Whitney, 9 Wall. 187; The Yosemite Valley Case, 15 Wall. 77; Railroad v. McShane, 22 Wall. 444; and Shepley v. Cowan, 91 U. S. 330, that it would be supererogation to go over the subject again."

The case of Lytle v. The State of Arkansas, 9 How. 314, referred to by Judge BRADLEY in the last case, and upon which it is chiefly based, had under consideration the same act of Congress, passed May 29, 1830. [4 Stat. at Large, p. 420.]

Section 1 of that act reads as follows: "That every settler or occupant of the public lands, prior

to the passage of this act, who is now in possession, and cultivated any part thereof in the year one thousand eight hundred and twenty-nine, shall be, and he is hereby, authorized to enter, with the register of the land office, for the district in which such lands may lie, by legal subdivisions, any number of acres, not more than one hundred and sixty or a quarter section, to include his improvement, upon paying to the United States the then minimum price of said land: Provided, however, that no entry or sale of any land shall be made, under the provisions of this act, which shall have been reserved for the use of the United States, or either of the several States, in which any of the public lands may be situated.''

Section two provides for the settlement of disputes where two persons had settled upon the same quarter section of land.

Section 3 reads as follows: ''That prior to any entries being made under the privileges given by this act, proof of settlement or improvement shall be made to the satisfaction of the register and receiver of the land district in which such lands may lie, agreeably to the rules to be prescribed by the commissioner of the general land office for that purpose, which register and receiver shall each be entitled to receive fifty cents for his services therein. And that all assignments and transfers of the right of pre-emption given by this act, prior to the issuance of patents, shall be null and void.''

The fourth section provides that said act shall not delay the sale of public lands beyond certain stated times; while the fifth, the last section, provides ''that this act shall be and remain in force for one year from and after its passage.''

This act of Congress is not nearly so full and specific in its requirements regarding the mode of sale and conveyance of public lands as is the act of the

Legislature of this State, approved March 1, 1855, which authorized the sale of the swamp lands located in this State.

By reading section three of said act of Congress it will be seen that the commissioner of the general land office is authorized by *rules to regulate* the mode or manner of entering and conveying the public lands of the United States.

Notwithstanding the laxity of that act of Congress, the Supreme Court of the United States, in the case of Lytle v. The State of Arkansas, supra, on page 331 to 333 said:

"The first section of the act of the 29th of May, 1830, gave to every occupant of the public lands prior to the date of the act, and who had cultivated any part thereof in the year 1829, a right to enter at the minimum price, by legal subdivisions, any number of acres not exceeding one hundred and sixty or a quarter section, to include his improvement; provided the land shall not have been reserved for the use of the United States, or either of the several States.

"In the third section of the act it is provided, that, before any entries being made under the act, proof of settlement or improvement shall be made to the satisfaction of the register and receiver of the land district in which the lands may lie, agreeably to the rules prescribed by the Commissioner of the General Land Office for that purpose.

"On the 10th of June, 1830, the Commissioner issued his instructions to the receivers and registers under the above act, in which be said, that the fact of cultivation and possession required 'must be established by the affidavit of the occupant, supported by such corroborative testimony as may be entirely satisfactory to both; the evidence must be taken by a justice of the peace in the presence of the register and receiver.' And the commissioner directed, that, where the improvement was wholly on a quarter-sec-

tion, the occupant was limited to such quarter; but where the improvement is situated in different quarter-sections adjacent, he may enter a half quarter in each to embrace his entire improvement. . . . It is a well-established principle, that where an individual in the prosecution of a right does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him. In this case the pre-emptive right of Cloyes having been proved, and an offer to pay the money for the land claimed by him, under the Act of 1830, nothing more could be done by him, and nothing more could be required of him under that act. And, subsequently, when he paid the money to the receiver, under subsequent acts, the surveys being returned, he could do nothing more than offer to enter the fractions, which the register would not permit him to do. This claim of pre-emption stands before us in a light not less favorable than it would have stood if Cloyes or his representatives had been permitted by the land officers to do what, in this respect, was offered to be done.

"The claim of pre-emption is not that shadowy right which by some it is considered to be. Until sanctioned by law, it has no existence as a substantive right. But when covered by the law, it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it. It is founded in an enlightened public policy, rendered necessary by the enterprise of our citizens. The adventurous pioneer, who is found in advance of our settlements, encounters many hardships, and not unfrequently dangers from savage incursions. He is generally poor, and it is fit that his enterprise should be rewarded by the privilege of purchasing the favorite spot selected by him, not to exceed one hundred and sixty acres. That this is the national feeling is shown by the course of legislation for many years."

And the Supreme Court of the United States and the Supreme Court of this State have repeatedly held that, "a person who complies with all the requirements necessary to entitle him to a patent in a particular lot or tract is to be regarded as the equitable owner thereof, and the *land is no longer open to location*" or sale.

From reading these cases, it will be seen that the courts uniformly hold that there is a lack of power on the part of the agents of the United States and of the States to sell these lands a second time; and that the question of notice, either actual or constructive, to a purchaser at a second sale is entirely irrelevant to the case. This is elementary, and is based upon the fact that the title to all real estate emanates from the United States, or from the State, and is evidenced by a patent.

The various proceedings necessary to be taken in order to procure a patent are matters of public record, kept in the office of the register of the public lands, which is the very office, and in charge of the very officer through which and under whom all such proceedings must be had in order to procure such patent. When such a person applies at that office and to that officer for a patent, he can procure a patent only to such lands as belong to the State and not previously sold or disposed of. This is based upon the principle that the State is a sovereignty and can do no wrong, nor can it be sued. *Ergo,* it cannot sell and convey the same tract of land twice, nor can a judgment be recovered against it, and thereby impose a lien upon the public domain in favor of a subsequent innocent purchaser.

The State and the various counties thereof act through statutory agents, whose powers and duties are prescribed by law; and those who deal with them must know the power and extent of all such agents. When they have once sold the land, their power is ex-

hausted, and they have no authority to sell the same lot or tract a second time.

This is also emphasized by the fact that there is no law which requires a patent to be recorded.

It will be remembered that section 37 of the Act of 1853, before set out, provides that the register of lands at Jefferson City, on the receipt of the notice of the sale of any swamp land, shall make out in the name of the State a patent, conveying the same to the purchaser, in the same manner as other patents are made and executed. And sections 8149 and 8150, Revised Statutes 1899, provide how said other patents shall be executed and recorded, and they read as follows:

"Sec. 8149. When such duplicate certificate shall be filed in the office of the Secretary of State, the Secretary shall make out a patent for the land mentioned in the same, granting to the purchaser, on the part of the State, the fee-simple therein.

"Sec. 8150. The patent shall be under the great seal of the State, signed by the Governor and countersigned by the Secretary of State, and shall be recorded by the Secretary of State in a book kept for the purpose of registering the patents for saline and seminary lands."

Only such instruments which are required to be acknowledged or proven are required to be recorded, as will be seen by reading section 923, Revised Statutes 1899, which reads as follows: "Sec. 923. Every instrument in writing that conveys any real estate, or whereby any real estate may be affected, in law or equity, proved or acknowledged and certified in the manner hereinbefore prescribed, shall be recorded in the office of the recorder of the county in which such real estate is situated."

They are generally recorded for the purpose of showing a perfect chain of title, but that is not necessary.

In the discussion of the legal effect of a patent, Mr. Jones, in volume 2 of his excellent work on "The Law of Real Property and Conveyancing," on page 269, sections 1377 and 1378, states the law to be as follows:

"1377. A patent from the United States for land need not be delivered or recorded. Title by patent from the United States is title by record; and though it is usual to deliver a patent to the claimant, as in case of deeds, yet delivery of it is not necessary. 'The acts of Congress provide for the record of all patents for land in an office, and in books kept for that purpose. An officer called the "recorder" is appointed to make and to keep these records. He is required to record every patent before it is issued, and to countersign the instrument to be delivered to the grantee. This, then, is the final record of the transaction—the legally prescribed act which completes what Blackstone calls "title by record"—and when this is done the grantee is invested with that title.'

"1378. The statutes in regard to recording do not apply to conveyances by a State. Such conveyances may be recorded, and generally are, but their effect as vesting title and affording notice is not dependent upon their being recorded. A statute authorizing the recording of such conveyances without acknowledgment is permissive only."

And in the case of Patterson v. Langston, 11 So. 932, the Supreme Court of Mississippi, in discussing the same question, speaking through CAMPBELL, C. J., said: "The statutes, as to recording instruments pertaining to land, do not embrace conveyances by the State. Such conveyances are not within the terms or the spirit of those statutes. There cannot be a lien creditor of the State, and commission of a fraud in selling land a second time is not predicable of the State; and any of its officers, clothed by law with power to sell its land, having exercised the power in the

manner authorized, has no power to make another valid sale of the subject of the first. The reason for the latter part of section 561 of the Code is this: By Acts of 1876 and 1878, the deeds of the auditor were required to be acknowledged, but no law required them to be recorded in the county in which the lands lie. The Code of 1880 dispenses with the acknowledgment, and entitled, but did not require, them to be recorded. Section 1622 of the Code provides that 'copies of the record of any writing required or permitted to be recorded . . . shall, when certified . . . be received in evidence in all courts,' etc. Patents issued by the United States or this State may be recorded in the county in which the land is, but their effect as vesting title in the patentee is not dependent on that. All these instruments are made recordable at the option of the person interested, that he may thereby preserve the evidence of his title by the public record of the county in which the lands may be, as well as by the original instrument. The appellant, by her purchase from the State, acquired title, and was not bound to lodge her conveyance with the chancery clerk; and the appellee acquired nothing by the conveyance afterwards made to her by inadvertence, and it should be canceled."

This principle is also recognized by section 8243, Revised Statutes 1899, which reads as follows: "In all cases where swamp lands have been or may hereafter be sold, which had been previously sold and patented by any county court in this State, to a *bona fide* purchaser, it shall be the duty of the county court of the county in which such sales were made, upon proper application of the subsequent purchaser, accompanied by the proper proof, showing the facts, to draw a warrant on the county treasury in favor of the person who paid the same, for the amount of such purchase money actually paid into the county treasury: Provided, that such person in whose favor such

warrant is drawn shall relinquish all interest and title in such land in favor of the county or the prior purchaser holding a prior patent to such lands.''

And in the light of that statute, the following testimony given by respondent is especially pertinent to this case: ''Q. You had this understanding with the county court; that if any of this land turned up to be owned by other parties, they were to refund the purchase money to you? A. Yes, sir.'' From this it appears that respondent not only knew the law governing such transactions, but that he actually contracted for this land with that law in mind.

Let us suppose for a moment that the law is not as we have before stated it to be, but that it is as contended for by counsel for respondent, namely, that the register of swamp lands has the power and authority to sell and resell the same tracts as often as he may be able to find buyers prior to the time the purchaser procures his patent from the State Register of Public Lands, and records it in the recorder's office of the county in which the land is located.

At the date of the passage of that act there was no railroad leading south from the city of St. Louis to Doniphan, the county seat of Ripley county; and the only mail route and means of travel between Jefferson City and Doniphan was by rail to St. Louis, thence by boat to New Madrid, and thence by overland stage to Doniphan, the latter distance about one hundred miles. In the very nature of things it would have taken the receiver of public moneys of Ripley county, had he acted with due expedition, at least a week or ten days to have transmitted the receipt for the purchase money to the register of lands at Jefferson City, as was required by section 5 of said act of the Legislature, approved March 1, 1855; and for the latter office to have made out and returned a patent for the lands so sold to the purchaser at Doniphan, as was required by section 37 of said act. If the contention of counsel for

respondent is correct, then there is no law which would hinder or could prevent the register of swamp lands from selling during that week or ten days the same tract of land over and over, as often as he could find persons who were able and willing to purchase. But instead of the purchaser getting his patent back from Jefferson City inside of a week or ten days, as before suggested, in all probability it would take a month or more for him to do so, and the chance for fraud and corruption would thereby be increased three or four fold. No sensible person would be so foolish or imprudent as to purchase swamp lands if he knew he had absolutely no protection for his property and was absolutely at the mercy of the swamp land register during that time.

The Legislature knew the conditions that existed at the time of the passage of said act, and knew that the law presumes every one knows the law, and with that knowledge and information before it, it is not to be presumed that it would pass an act inviting persons to purchase such lands, and at the same time afford them no protection whatever for such investments. To place such a construction upon this act would unjustly criticise the high sense of duty the law-maker entertains for the citizen, and it would underestimate the average intelligence of the people of the State, and, evidently, the Legislature designed that all who contributed to that welfare by investing their money in these swamp and overflowed lands should be protected in their property rights, and never intended that their interests should have no legal protection from the date of such purchase to the date of the receipt of the patent for the same from the State. Such a construction if placed upon this act would be unjust and unreasonable, and contrary to the well settled rules of statutory construction. [Water & Light Co. v. Lamar, 128 Mo. 188; Cole v. Skrainka, 105 Mo. 303; Corrigan

v. Kansas City, 211 Mo. l. c. 651; State ex rel. v. Railroads, 215 Mo. 492.]

I am, therefore, clearly of the opinion that it is not a question of notice, either actual or constructive, that is involved in this case, but one of power and authority on the part of the register of swamp lands to sell such lands a second time; and this he cannot do, as has been held by this court and the Supreme Court of the United States, in numerous cases.

This view of the case renders it unnecessary for me to notice what effect, if any, the Act of 1864, changing the location of the dividing line between Butler and Ripley counties, had; also the question as to whether or not respondent had actual or constructive notice of appellant's title. Under the law as declared by this court and by the Supreme Court of the United States, those questions are wholly immaterial.

I am, therefore, of the opinion that the judgment should be reversed, with directions to the circuit court to enter judgment in behalf of appellant, as prayed. All concur except *Graves, J.,* who dissents; *Valliant, J.,* also files concurring opinion.


### SEPARATE CONCURRING OPINION.

VALLIANT, J.—I concur in all that is said in the opinion of my learned brother WOODSON in this case and there is one other point that I wish to mention. There are certain links in the chain of title to overflowed lands in Missouri of which every one purchasing such land is charged with notice, *viz.*: That the title in the beginning was in the United States, that the title passed by a public act of Congress to the State of Missouri, that it passed by a public act of the General Assembly to the several counties in which the lands were situate; that is to say, although at the date of the sale of the land in question the State still retained the legal title, yet the State had constituted

the counties its agents authorized to sell on the terms and in the manner prescribed by law, the patent to be issued by the State pursuant to a sale by the county.

The officers entrusted with these sales in the several counties were required by law to keep a record of their acts. All these public laws the purchaser was bound to take notice of and he was bound to know what the books and files in the public offices where these sales were made would show. He was also charged with notice of the fact that the land he was about to purchase was, at the date of the several public acts of the General Assembly, in a certain county, and that the records of that county, the books and files in the offices of the several officers charged with the duty of making the sales, would show what if anything the county had done in the way of selling the land. The defendant in this case, therefore, was charged with notice that this land at one time lay in Ripley county, and that while it was in that county, the county had authority from the State to sell it, and that if sold the records, books and files in the offices of the county would show it.

The books of the offices of Ripley county were open to this defendant, they showed that a sale was made and he is charged with knowledge of that fact. *Fox, C. J., Gantt, Lamm* and *Woodson, JJ.,* concur.