# J. C. RUSS, Appellant, v. THOMAS B. SIMS.

**Division One, July 14, 1914.**

1. **SWAMP LANDS: History of Acts.** The various acts of Congress and of the General Assembly concerning swamp lands, and especially those affecting titles to such lands in the ten counties in southeast Missouri, and more especially in the counties of Cape Girardeau, Dunklin, Mississippi, New Madrid and Pemiscot, are traced step by step in the opinion; and as incident thereto the wandering habitat of the "Register's Book" and the "Receiver's Book" in Pemiscot county and the development of Carleton's Abstracts are explained—except that this history does not include the acts permitting Pemiscot, Dunklin and other southeastern counties to donate swamp lands to railroad, toll road, plank road and other corporations.

2. ———: **Title Passed to State: Delay in Patents.** The Act of Congress of September 28, 1850, was a grant to the State of Missouri of the unsold swamp lands lying within its boundaries, and any delay in the issuance of patents to the State or the selection of the swamp lands falling within the designations, did not defeat or impair the title of either the State or its grantees.

3. ———: **Delay in Patents: Consequent Confusion.** In many cases neither the State nor the county had patents to swamp lands in the ten counties of southeast Missouri prior to 1870, although for fifteen years prior thereto such lands were being sold by the counties under authority of statutes, the money paid, triplicate receipts issued by the designated county officers, and entry of such sale and the name of the entryman made in the Receiver's Book; and hence it was that title depended upon those receipts and books, and when the receipts were lost, or the county courthouse burned, wherein such books and duplicates of such receipts were, by statutes pertaining to the counties of Cape Girardeau, Dunklin, Mississippi, New Madrid and Pemiscot, required to be kept, great confusion in titles to many tracts resulted, since, after they were sold and paid for and no patents were issued, the county subsequently sold them a second time.

4. ———: **Equitable Title: No Patent.** A purchaser of swamp land who complied with all the requirements of the law relating to the sale of such land (paid the purchase price and received regular receipts of the receiver and register), acquired

the equitable title, although, through some fault of the State or county, he received no patent therefor.

5. ———: ———: Notice.  The Register's Book and Receiver's Book, showing that certain swamp land has been entered and paid for by a certain entryman, if kept in the manner required by the various statutes relating to such lands, are notice to the world that the county has sold the land; and a subsequent purchaser from the county purchases subject to the rights of such former purchaser and his grantees.

6. ———: ———: ———: Common Source.  In a suit to quiet title, where all parties claim under a common source, it is of no consequence whether such common source was the owner of the legal or of a mere equitable title.

7. ———:  Evidence:  Carleton's Abstracts:.  Original.  If Carleton's Abstracts of swamp lands in Pemiscot county is admissible as evidence of title under either act of the Legislature pertaining thereto (Laws 1901, p. 251, or Laws 1907, p. 271), then the original Receiver's Book and Register's Book from which they were made, though for some years not in the courthouse or the possession of the county clerk, are also admissible.

8. ———:  Tax Suit:  After Sale by Owner.  A judgment for taxes against the original equitable owner of swamp land and a sale thereunder, begun and made long after he had by recorded deed conveyed the land to another, conveyed no title to the purchaser at the tax sale.

9. ———:  Tax Sale:  At No Term of Court.  The Supreme Court takes judicial notice of the terms of the circuit court, and knows that the terms of said court in Pemiscot county in 1879 began on the "second Monday of March and September," and therefore a tax deed reciting that the land was sold "at the November term, 1879, of said court" is void on its face.

10. ———:  Limitations:  Estoppel.  Where the evidence shows the lands were wild swamp land, covered with timber, uncultivated and in the possession of no one, neither the defense of limitations nor of estoppel is available.

Appeal from the Ste. Genevieve Circuit Court.—*Hon. Charles A. Killian*, Judge.

REVERSED.

*J. R. Brewer* and *Arthur L. Oliver* for appellant.

(1) This being a suit under Sec. 2535, R. S. 1909, with a common source of title proven, the court is

limited to the respective claims of title, between plaintiff and defendant. Graton v. Halliday Lbr. Co., 189 Mo. 322; Gage v. Cantrell, 191 Mo. 705; Machine Wks. v. Bowers, 200 Mo. 219; Dixon v. Hunter, 204 Mo. 390. James B. Easley, the record owner of the land, was never sued. His father, who had owned the land up to April, 1873, was sued for the taxes thereon in 1879. (2) Defendant Sims has absolutely no title to the land in question because in 1871 the terms of the circuit court in Pemiscot county were fixed to begin on the "Second Monday of March and September." There could have been no November term of court in Pemiscot county, nor was there any. The law then, as now, required all such sales to be made during a term of the circuit court. Secs. 2380, 6838, R. S. 1879. (3) Since the tax deed under which defendant Sims claims title is void, his plea of estoppel and laches are of no avail, for the following reasons: (a) Because no possession of the lands in controversy was ever held by defendant Sims, or by anyone under whom he claims. (b) No improvements have been made on the lands in dispute by respondent or by anyone under whom he claims. Under these conditions the nonpayment of taxes by plaintiff, or those under whom he claims, is not laches, nor is it sufficient in this case to estop him. Swearingen v. St. Louis, 151 Mo. 361; Haarstick v. Gabriel, 200 Mo. 237; Lumber Co. v. McCabe, 220 Mo. 178; Chapman v. Templeton, 53 Mo. 463; Cashman v. Cashman, 123 Mo. 649; Bollinger v. Chauteau, 20 Mo. 89; Brown v. Bacquin, 57 Ark. 97; Raymond v. Monsen, 59 Iowa, 371; Whitman v. Show, 166 Mass. 451; Cook v. Rounds, 60 Mich. 310.

*Hope, Green & Seibert* for respondent.

(1) There was no competent testimony in this case showing that William G. Easley, under whom plaintiff claimed title, had ever acquired any title

whatever to this land from Pemiscot county. The entries in the alleged Receiver's Book were incompetent testimony in this case. 1 Greenleaf on Evidence (16 Ed.), sec. 485, p. 632; Starkie on Evidence, secs. 202, 315; 3 Wigmore on Evidence, sec. 2158, p. 2926; 3 Wigmore on Evidence, sec. 1632, p. 1979. (2) But on the theory that William G. Easley got title from the county, the trial court correctly held that if William G. Easley had ever attempted to convey the land in controversy to James B. Easley, then such conveyance was not admissible to record in the office of the recorder of deeds of Pemiscot county, because acknowledged before a justice of the peace of the State of Tennessee, and even if it was recorded therein, the record thereof imparted no notice to subsequent purchasers, and, therefore, under the law the title to said land passed to Virgil P. Adams by the sheriff's sale under the judgment for taxes against said William G. Easley, and the sheriff's deed offered in evidence by plaintiff. Cowell v. Gray, 85 Mo. 169; Campbell v. Johnson, 44 Mo. 247; Gatewood v. House, 65 Mo. 663; 2 Devlin on Deeds, secs. 1010, 1013; Dickers v. Barnes, 79 N. C. 490; Muldorn v. Deline, 135 N. Y. 150; Hinchey v. Nicholls, 72 N. C. 66; Capps v. Holt, 5 Jones's Eq. 153; Fuller v. Fullows, 30 Ark. 657; Harkness v. Devine, 73 Tex. 628; George v. Bates, 90 Va. 839; Perry v. Price, 1 Mo. 553; Tiedeman on Real Property, sec. 776; Lionberger v. Baker, 88 Mo. 447. (3) Proof of long payment of taxes by the respondent Sims, together with the laches proven on the part of the plaintiff, and the Easleys under whom plaintiff claims, were such as to bar the plaintiff from recovery herein by virtue of the equitable doctrines of laches and estoppel. 1 Pomeroy's Eq. Jur. (3 Ed.), secs. 418, 419; Morrison v. Turnbaugh, 196 Mo. 447; Dexter v. McDonald, 196 Mo. 400; Underwood v. Dugan, 139 U. S. 380; Moran v. Horsky, 178 U. S. 205.

WOODSON, P. J.—This suit was instituted in the circuit court of Pemiscot county, by the plaintiff against the defendant, to quiet the title to two hundred and forty acres of land, situated in that county, under old section 650, Revised Statutes 1899, now section 2535, Revised Statutes 1909, particularly described as follows: the northwest quarter of section eight, and the north half of the northeast quarter of section eighteen, all in township seventeen, north, of range eleven east.

On change of venue the cause was transferred to the circuit court of Ste. Genevieve county, where the cause was tried May 2, 1908, and taken under advisement. Pending the submission, over the objection of plaintiff, the court re-opened the cause, and after one year permitted the introduction of other evidence, and on May 1, 1909, rendered judgment for the defendant.

The plaintiff based his right to a recovery upon equitable grounds, as follows:

That while the legal title to the lands in controversy (swamp land) had never emanated from Pemiscot county, yet the equitable title had so passed by virtue of certain receipts from the receiver of lands of that county showing that William G. Easley had purchased the same, according to law, on September 12, 1858.

The plaintiff claims title to the land through said Wm. G. Easley, by reason of the following deeds of conveyances:

(a) Pemiscot county to William G. Easley, certificate of entry No. 987, dated July 17, 1858, consideration $800, recorded in Register's Book No. 1, at page 35. Lands conveyed: Northeast quarter of section No. 8, township No. 17 north, range No. 11, east, and other lands.

(b)  A quitclaim deed from William G. Easley and wife to James B. Easley, dated April 13, 1873, and duly recorded on the following day.

(c)  Quitclaim deeds from the heirs of James B. Easley to plaintiff, bearing different dates in the year 1906, duly recorded.

The defendant's title is deraigned through the following deeds:

(1)  A sheriff's tax deed to Virg P. Adams, dated March 10, 1880, purporting to convey the interest of William G. Easley to the land in controversy.

(2)  A quitclaim deed from Virg P. Adams to Benjamin F. Barcroft, dated September 29, 1885, and recorded November 19, 1885.

(3)  A mortgage deed from Benjamin F. Barcroft to T. B. Sims, the respondent, dated September 15, 1881, and duly recorded, date not given.

(4)  Mortgagee's deed from T. B. Sims, mortgagee, to T. B. Sims, the respondent, dated December 14, 1887, all of which purported to convey the land in controversy, except that described in the sheriff's deed, which will receive further consideration later.

The defendant testified that he did not claim any title to the land in controversy, except as above stated. For some reason, not made clear, counsel for respondent seem to have objected to the introduction of various receipts and entries offered from a book called the "Receiver's Book," in the possession of one J. R. Brewer, one of the counsel for appellants, regarding the entry of the land and payment of the purchase price thereof to the receiver of swamp lands in that county, by William G. Easley, in the year 1858; but, when we come to consider the evidence of respondent regarding the same matters, we find that they rely upon the same papers or receipts, which, however, are found in Carleton's Abstract, which are copies of the same Receiver's Book previously mentioned.

The court found for the defendant, and rendered judgment accordingly, and the plaintiff duly appealed the cause to this court. Such additional facts, as may be necessary to illuminate the legal propositions involved, will be stated in connection therewith.

I. The first proposition presented for determination is the action of the court in admitting
**Historical** in evidence the original Register's Books
**Development** etc., of Pemiscot county.
**of Swamp**
**Land Laws.** It is somewhat difficult to understand the law governing Carleton's Abstract, without knowing something of the history of the swamp land legislation of Southeast Missouri; and for that reason, as well as to throw some light upon the swamp land titles of that section of the State, and the legislation governing the same, I here present a very carefully prepared history of the laws regarding those subjects.

It is fundamental that originally the United States held title to all lands now designated in the legal and political history of this State by the name of "swamp lands." There was passed and approved on September 28, 1850, by the Congress of the United States an act entitled, "An act to enable the State of Arkansas and other States to reclaim the swamp lands within their limits." [9 U. S. Stat. at Large, p. 519.] The express intent of the above act, as set out therein, was that these lands should be given to the State of Arkansas and, as by another section of said act provided, to each of the other States of the Union, for the purpose of constructing necessary levees and drains to reclaim such swamp and overflowed lands as were wet and unfit for cultivation, inferably in their then state. The act applied only to such swamp lands as then remained unsold by the Federal Government. It was made the duty of the Secretary of the Interior, by sec-

tion 2 of such act, to make out correct lists and plats
of such swamp lands and cause a patent to the State
to be issued therefor. By section 4 of such act, as
foreshadowed above, its provisions were extended to
each of the other States of the Union in which swamp
and overflowed lands might be situated. The effect
of this grant, which by its terms was a grant *in prae-
senti,* was to pass title to the State to such lands as
fell within the above definition. It is not necessary
here, or to the point in hand, to inquire into the de-
tails, or into the effect of this grant. It has been held,
however, that the issuance of the patents therefor to
the State, or any delay in the issuance thereof, or in
the selection as swamp lands of the lands falling within
the definition, did not defeat or impair the title of the
State or that of the State's grantees. The State and
her grantees might be embarrassed in the assertion of
their rights, in that, proof *aliunde* as to the condition
of the lands in question might be made necessary, that
is, as to whether in fact the lands were swamp and
overflowed or not, but no other consequences would
follow. [Irwin v. San Fran. Sav. Union, 136 U. S.
578; Wright v. Roseberry, 121 U. S. 488; Tubbs v. Wil-
hoit, 138 U. S. 134.]

Difficulties very naturally ensued, in that it was
found that after the State authorities in pursuance of
law and instructions to this end, had selected and duly
reported to the proper departments at Washington
such swamp and overflowed lands, many tracts there-
of were found to be occupied by squatters claiming
title, or claiming pre-emption rights therein. The
Commissioner of the General Land Office had, it seems,
opened such lands to contest and litigation, and upon
*ex parte* testimony large areas thereof were being
stricken from the swamp land list, thus depriving the
State of Missouri and the several counties in which
these lands lay, of their just portions thereof. A joint
resolution was passed by the General Assembly of Mis-

souri calling attention to this difficulty and requesting
some legislation in amendment of the situation. [Laws
1855, p. 534.]   Thereafter Congress passed an act sup-
plementary to the act of September 28, 1850. This act
was passed March 3, 1857 (11 U. S. Stat. at Large, p.
251), and among other things not pertinent, it con-
firmed to the several States the swamp lands therein
and theretofore by the act of September 28, 1850,
granted to the States "and reported to the Commis-
sioner of the General Land Office so far as the same
shall remain vacant and unappropriated and not in-
terfered with by an actual settlement under any exist-
ing law of the United States." It further required
such selection of swamp lands to be patented to the
several States in conformity to the revisions of the
act as soon as practicable. Thus stands the legal his-
tory of this swamp land grant to the State.

These swamp lands were reported by the Govern-
ment surveyors engaged in sectionizing the public do-
main to be such, and in the course of many years
patents were issued to the State from time to time for
this land. This work of issuing these patents and
thus confirming the swamp land selections made, con-
tinued in a desultory way for more than twenty years.
From this arises some of the peculiar and otherwise
inexplicable methods with which the State and coun-
ties subsequently dealt with these lands.

The 16th General Assembly of Missouri met some
three months subsequent to the passage of the swamp
land grant by the Congress and forthwith began leg-
islating on the subject of swamp lands. The first act
passed in point of time, had reference solely to the
southeastern group of Missouri counties, which em-
braced New Madrid, Mississippi, Scott, Cape Girar-
deau, Stoddard, Dunklin, Ripley, Butler, Wayne, and
after February 19, 1851, Pemiscot. The act was en-
titled, "An act to provide for the reclamation and sale
of overflowed and swamp lands in the southeastern

portion of this State,'' and was approved February 13, 1851. [Laws 1851, p. 232.] It will be noted that Pemiscot county is not by name mentioned in said act. This for the reason that at this time Pemiscot county was a part of New Madrid county, not having then been organized. It was organized six days later, however, that is to say, on February 19, 1851. [Laws 1851, p. 190.]

This first act provided for certain commissioners to be known as the ''Board of Swamp Land Commissioners,'' whose duties it was to devise some plan of reclamation and carry the same into effect. The sum of fifty thousand dollars was appropriated for the use of this board. Pursuant to this act a land office was established at Benton, in Scott county, where, it was provided by such act, all of the swamp lands in each of the counties of said southeastern group should be sold. The lands were to be sold for not less than $1.25 an acre. This sale was to be a public one and at the end thereof all such swamp land as remained unsold was to be subject to private entry at the same price. The money arising from the sale of said land was to be paid into the treasury of the State to the credit of a fund to be known as the ''Swamp Land Fund.'' This fund was to be used in re-payment to the State of the appropriation of fifty thousand dollars. No provision was made by this act for the disposal of any surplus from the sales of this land. By the provisions of this act whenever any land was paid for in full by the purchaser thereof at any sale, duplicate receipts were to be made, of which one was given to the purchaser and the other was to be certified to the Secretary o State. Upon receipt of such duplicate by the Secretary of State it was the duty of the Governor to issue a patent for such land to such purchaser.

There was passed by this same 16th General Assembly a few days subsequent to the passage of the above act, that is to say on March 3, 1851, another act

applying to all of the other counties in the State except Butler, Cape Girardeau, Dunklin, Mississippi, New Madrid, Pemiscot, Ripley, Scott, Stoddard and Wayne, which we may call for convenience the "southeastern group." The act last above mentioned was entitled: "An act donating certain swamp and overflowed lands to the counties in which they lie." [Laws 1851, p. 238.] This act recited in the first section thereof that "in order to provide for the reclamation of all overflowed and swamp lands which were granted to the State of Missouri, for that purpose, by an act of the last session of the Congress . . . all said lands in this State are hereby donated to the counties in which said lands respectively may be situated." As stated, the southeastern group was by this same section expressly excepted. The county court of said several counties, except the southeastern group, was by virtue of said act authorized to order the sheriff to sell said lands in such quantities, at such time and place and on such terms as such court may think proper. Upon the making of full payment for any of said lands, this act provided that a patent therefor should be signed by the Governor and countersigned by the Secretary of State. The net proceeds of all such lands, after paying the expenses of drainage, reclaiming, surveying and selling the same, *were to be paid into the county treasury and become a part of the common school fund of the given county in which the land lay.* The Governor of the State was required by this act, as soon as he should receive from the Government of the United States lists and plats of such lands, to transmit copies thereof to the several county courts wherein such swamp lands might lie. This act specifically mentions and excepts Pemiscot county, having been approved twelve days after the erection and organization of said county.

So remained the status as to title of these swamp lands so far as the southeastern group is concerned till the meeting of the 17th General Assembly. This Legislature passed an act approved February 23, 1853, entitled simply, "An act donating swamp lands to the several counties in which they lie." [Laws 1852-3, p. 108.] This act applied only to the above-named ten counties in the southeastern group. The first section of said act donated these swamp lands to the counties in the southeastern group upon the same terms and provisions of the act of March 3, 1851, supra, applying to all the other counties in the State. But it was required that such southeastern group should refund to the State the fifty thousand dollars by the State appropriated for the use of the Board of Swamp Land Commissioners in the drainage and reclamation of the swamp lands in such group. It was also provided that the counties in said southeastern group should be entitled to their proportion of the money due to the State of Missouri from the United States on account of swamp lands erroneously sold by the United States, or taken by squatters under pre-emption claims, between September 28, 1850, and March 3, 1857. This also abolishes the Board of Swamp Land Commissioners of the southeastern group which had been created by the act of February 13, 1851. This act had the effect in a very crude and inartificial sort of way, of placing the drainage and reclamation of the swamp lands in the hands of the county courts of the counties, in the said southeastern group. It will be noted now that as to the manner of reclamation; as to the officers who were to have charge of such reclamation; as to the sale of such lands and as to the ultimate resting place of the net proceeds arising therefrom (to-wit, into the several school funds of the several counties of such group), and as to the person who should issue patents thereto (to-wit, the Governor of Missouri), all of the counties in the State having

swamp lands stood upon a parity. In effect, by section 9 of this act it was provided that such lands might be sold for not less than one dollar per acre. We say in effect, because it will be noted that this section does not provide for the sale of land, but for scrip, which was locally known as "swamp land scrip." This scrip was issued to those who might do the work of drainage and reclamation, or, perhaps at times, for cash to be expended upon such work, and later on, at the will of the holder of such scrip or of his assignees, it was "located," as it was locally called, by selecting from the list of the local register of lands those certain swamp lands which the "locater" desired to buy. Afterwards such swamp land scrip was turned in to the receiver of public moneys of the local land office, who thereupon issued a *certificate of entry*, locally so-called, but in fact and reality a receipt in triplicate, to the holder of the scrip who was the purchaser of the land. This receipt, or certificate of entry, entitled the purchaser to a patent, as we shall see more in detail later.

The 18th General Assembly passed an act amending the act of February 13, 1851, by repealing so much of the same as required the counties of the southeastern group to refund to the State the proportion each of them had received of the fifty thousand dollars heretofore mentioned. [Laws 1854-5, p. 160.]

This same General Assembly passed an act on the 28th of February, 1855, which contained but one section. This act was entitled, "An act amendatory of an act 'donating certain swamp and overflowed lands to the counties in which they lie,' approved March 3, 1851." [Laws 1854-5, p. 160.] This one-section act was in full, enacting clause omitted, as follows:

"That the several county courts of this State are hereby authorized to sell and dispose of the swamp and overflowed lands within their respective counties, either with or without draining and reclaiming the

same, as in their discretion they may think most con-
ducive to the interests of such county. This act to be
in force from its passage.''

On the next day following the passage of the act
last above set out the most important act, so far as
concerns the counties in the southeastern group, was
passed. This act was entitled, ''An act in relation to
swamp lands in the counties of New Madrid, Pemiscot,
Mississippi, Scott, Cape Girardeau, Stoddard, Wayne,
Ripley, Butler and Dunklin.'' [ Laws 1854-5, p. 154.]
This act contained a group within a group in this, that
a subgroup consisting of Scott, Dunklin and Pemiscot
counties was erected in the said southeastern group,
and certain small differences in administration and ad-
ministrative offices was provided for this subgroup.
This will be hereafter referred to, as well as another
small difference in this act which latter variation af-
fected Pemiscot county alone.

Section one of the above act provided that the
clerks of the county courts of all the counties in the
southeastern group (except in Scott, Dunklin and Pem-
iscot counties) should be *ex-officio* registers of lands
within their several counties; section two provided
that the treasurers of the above named counties, again
except Scott, Dunklin and Pemiscot, should be *ex-of-
ficio* receivers of public moneys arising from the pro-
ceeds of the sale of swamp lands situated in said sev-
eral counties. In the counties of Scott, Dunklin and
Pemiscot such registers of swamp lands and receivers
of public money arising from the sale of such lands,
were to be elected; otherwise, the duties of all such
registers and receivers of lands in the southeastern
group were similar, according to the provisions of
this act. Section 3 of said act provided for the giving
of bonds, both by the receiver and register of swamp
lands, conditioned that such officers ''shall perform
all the duties required of them by law, and account for
all money, *books and papers* which may come into their

possession, at such times and places as may be required by law, and at the expiration of their term of office deliver to their successors respectively, all moneys, *books and papers* that may belong to, their respective offices.'' Section four of said act provided that upon the sale of any swamp land the register of lands should ''make triplicate certificates of the fact, describing the land so sold by its numbers and quantity, to whom sold and the amount of the purchase money per acre, and in the aggregate,'' and that he should deliver one of such certificates to the purchaser, file one in his office and transmit the other to the register of lands at Jefferson City, together with an abstract containing the numbers of the land, the number of the certificate, the name of the purchaser and the amount of the purchase money. Upon the presentation of the purchaser's original of this certificate of purchase issued in triplicate by the register to the receiver of public moneys such receiver was required to issue triplicate receipts to the purchaser conntaining the same information as contained in the certificate of purchase issued by the register as aforesaid, and evidencing the payment of the money or the equivalent thereof, in scrip, as paid by the purchaser. One of such receipts, it was provided, should be delivered to the purchaser, one was to be filed in the receiver's office and the other transmitted to the register of lands at Jefferson City, together with an abstract, giving such the identical information which was required to be given by the register's abstract of purchase. Upon the receipt of such certificate, receipts and abstract by the register of lands at Jefferson City, and upon his comparing the same and ascertaining that they were correct, it became the duty of the Governor to cause to be issued a patent to the purchaser of such land. This act also provided, in section 19 thereof, for the survey by the counties, through their county courts, of all swamp lands in such counties which had not

theretofore been surveyed by the authority of the
United States, and for the filing of one copy of the
surveyor's plats and. field notes in the office of the
county register of lands, and one copy thereof with
the State Register of Lands. This was later changed,
by a local act as to Pemiscot county (Laws 1856, p.
473), by requiring these latter plats and field notes to
be filed with the Secretary of State.

The county courts of the several counties were
empowered, upon the giving of ninety days notice by
the sheriff of the time and place of sale and of the
lands to be .sold, to cause said lands to be offered for
sale, which sale it was provided, was to be conducted
by the register of lands. The highest bidder at the
public auction so held became the purchaser. The lands
remaining unsold were thereafter subject to private
entry with the register and receiver, as in the manner
heretofore pointed out. The minimum price, it was
provided by section 18 of said act, whether sold at
public sale or private sale should be the sum of one
dollar per acre. No provision was made in this act for
the disposition of the surplus money, if any should be
left after draining and reclaiming these lands. .

By section 29 of said act, it was specially pro-
vided that as to Pemiscot county all contracts made
therein and executed in good faith, prior to March,
1855, and all contracts not executed and entered into
prior to April, 1855, and having relation to swamp
lands in that county, should be held to be legal. This
special provision seems to be explainable only by a
matter of local history, which is, that contracts under
previous laws had prior thereto been made by the
county court of Pemiscot county for the construction
of a levee along the west shore of the Mississippi river
and on the east side of Pemiscot county, to prevent
floods from the waters of said river. These contracts
for building levees, it seems, had in many cases been
fully executed and in many other cases were being then

carried on. These contractors were being paid for the most part, if not wholly, in swamp land scrip, which they or their assignees "located" upon such parcels of swamp land as they desired to purchase, from the register of lands and the receiver of public moneys of that county.

By the act of November 23, 1855 (Laws of 1855, p. 351), which also seemingly applies only to the southeastern group, certain provisions were made, more nearly defining the rights of pre-emption, which right was specifically conferred by the act of March 1, 1855, supra. This act also provided that in all counties wherein registers and receivers were required to be elected, such officers should hold their office for the term of two years, and that vacancies should be filled by appointment of the county courts, except in Mississippi county, wherein the Governor was given the right to appoint such register and receiver. This act is a very fine example of the manner in which legislation upon the subject of swamp lands was rendered ambiguous, doubtful, complicated, tangled and irreconcilable.

It may be noted as important upon the question of the deraignment of a swamp land title, that chapter 93, entitled "Swamp and Overflowed Lands" (R. S. 1855, p. 1005), did not apply to such southeastern group and therefore did not apply to Pemiscot county, for section 20 thereof expressly exempts the counties of the southeastern group from the provisions of chapter 93.

The 19th General Assembly passed an act on the 27th of February, 1857 (Laws 1856-7, p. 271), entitled simply, "An act in relation to the disposal of swamp lands," which again subdivided the law touching swamp lands in the southeastern group, by providing that whenever the county courts of either of the counties of Cape Girardeau, Dunklin, Mississippi, New Madrid and Pemiscot should be satisfied that full pay-

ment had been made according to the terms of sale for any of the lands sold as swamp lands under any of the acts of the General Assembly of this State authorizing such sale, they should cause to be issued to the purchaser, his heirs or assigns a patent for the same. This patent was to be issued in the name of the State under the seal of the county court of the county issuing it, and to be signed by the president of the county court, and attested by the clerk thereof, and should grant and convey to the grantee therein named all the right, title and interest that the county had acquired to the land therein described under the several acts of Congress and of the General Assembly of this State. By a further section of this act it was made the duty of the Governor to furnish to each of such counties a list of all the swamp lands therein, which list was required to be filed in the office of the county clerks of such counties, and was to become a public record, and a copy thereof, it was provided, was to be received as prima-facie evidence of title in such county, to such, in all courts and places in this State. It was further provided that said act should be a public act and be in force from and after its passage. The effect of this enactment was to take these five counties named above out of the southeastern group so far as concerns the manner of issuing a patent to the swamp lands therein.

This act explains and throws full light upon an act passed on the 4th day of November, 1857, following. [Laws (Adj.) 1857, p. 269.] Read in the light of the act next before mentioned, and which gave power to the county courts to issue patents to swamp lands in said five counties, the act last mentioned seems more reasonable than it would otherwise at first blush appear. This last mentioned act was entitled, "An act supplementary to an act entitled 'An act in relation to the disposal of swamp lands in the counties of Cape Girardeau, Dunklin, Mississippi, New Madrid and

Pemiscot, approved February 27, 1857.' '' The first and only section of the latter act provided, in full, enacting clause omitted, as follows:

"Section 1. That the *Secretary of State is hereby required to return by due course of mail, all the certificates of entry and payment of and for said lands,* to the respective county courts named in said act, and that the county courts of the respective counties so named shall have the entire control of the matters contemplated in said act, any law to the contrary notwithstanding. This act to be in force from and after its passage. Approved November 4, 1857.'' (Italics ours.)

The act to which the section last above was expressed to be an amendment, declared itself to be a public act.

The act above set out has been productive of practically all the trouble and legal difficulty which have arisen in the five counties 'of the southeastern group, particularly and specifically mentioned in this act. Many of these counties have lost their records by fire or by war, in which catastrophes the duplicate certificate of purchase kept on file by the register of lands and the duplicate receipts for the purchase money kept on file by the receiver of public moneys, as well as the triplicate of the certificates of purchase and receipts formerly in the hands of the State Register of Lands, and returned by him pursuant to the act of November 4, 1857, were all wiped out of existence; leaving no original records except a little slip of paper held by the original purchaser. When the latter was lost and the records burned or destroyed by war, as either partially or wholly transpired in Pemiscot and other counties, the entire transaction was wiped out of existence, so far as any paper records thereof were concerned.

If it be asked why patents were not issued by the several counties of this State upon the filing at Jeffer-

son City with the Register of Lands of the triplicate certificates of purchase and the triplicate receipts for the payment of the purchase money, the answer is, that for more than twenty years the slow matter of selling these swamp lands and the matter of issuing patents to the State by the United States therefor, were dragging along without being fully accomplished. The lands were being surveyed and patents were being issued therefor all these years. Likewise and on account of delays in surveying and consequent selection of the lands as swamp lands and on account of the Civil War, the State of Missouri did not issue these patents to the several counties in which these lands lay for the most part until subsequent to the year 1870, and from 1870 down, in many cases to a much later period, these patents were made to the State and by the State to the several counties from time to time. Practically none of them, if any at all, were issued promptly. The delay on the part of the State authorities was due to the delay in the selection of this land by the Interior Department and to the delay of the United States Government to issue patents for the State therefor. Hence it was that the title to many hundreds of tracts of these lands depended from 1855 solely on these receipts to the purchasers from the office of the receiver of public moneys. In a great number of cases neither the State nor the county had patents therefor till subsequent to the year 1870. What is said touching delays in issuing patents applies to the conditions only in the southeastern group.

Another act affecting the swamp lands in the State was passed by this same 19th General Assembly. This act was entitled ''An Act Amendatory of an act entitled 'An Act donating swamp and overflow lands to the counties in which they lie,' approved December 13, 1855.'' [Laws 1857, p. 32.] The above act contained but two short sections, the first of which provided that all swamp lands which have been or may

hereafter be patented to the State *"be and the same are hereby declared to vest in full title, and belong to the counties in which they may lie."* The second section merely provided that the act should take effect and be in force from and after its passage, any law to the contrary notwithstanding.

Following this no other act of importance, so far as the title to this land is concerned, was passed by the Legislature until the acts respectively of March 27, 1868 (Laws 1868, p. 68) and the Act of March 10, 1869 (Laws 1869, p. 66). A combination of these two acts carried into the subsequent revisions have come down to us as the law of to-day in all the counties in the State touching these lands. Some minor amendments have been made, but they are of comparatively recent date and affect only a limited portion of the lands in the southeastern group.

The act of March 27, 1868, supra, was entitled simply, "An Act in relation to swamp and overflowed lands." It put the control of such lands, as well as the matter of issuing patents therefor, wholly into the hands of the several county courts of the counties of the State; it provided that none of said lands should be sold for less than $1.25 per acre within five years from the first day of January, 1866; it provided that the State Register of Lands should issue a patent to all lands which had been sold by the several county courts in their respective counties since the fourth day of November, 1857, upon such State Register of Lands being furnished by the various county courts an abstract of all the sales of such lands made subsequent to the period aforesaid. Just here it may as well be said that by section 6 of the later act above referred to, that of March 10, 1869, the matter of issuing patents to swamp lands was taken from the Register of Lands, and put into the hands of the county courts wholly, where it has ever since remained. It will be noted, however, that as to Pemiscot, Cape

Girardeau, Dunklin, Mississippi and New Madrid counties, the authority in their several county courts to issue patents to swamp lands already inhered and had existed continuously from and pursuant to the act of February 27, 1857. [Laws 1856, p. 271 et seq.] Such patents had not been so issued in the great majority of cases by reason of the vicissitudes of war and because of the delay in selection of these lands as swamp, the delay in issuing patents from them to the State, and the delay in issuing patents by the State to these counties. The lands were regarded for the most part in those days as being utterly worthless, and trouble or money expended for a patent, even if the other reasons suggested had intervened, was an unnecessary toil and a useless expense. At any rate, *no such patents for untold thousands of acres of this land were issued,* which, regardless of the good reason or any reason for the omission, make out a condition to be met, and explanations become valueless.

The proceeds of all such sales of swamp lands after paying the expenses of drainage, reclaiming, surveying and selling the same, were required to be paid into the county treasury and to become a part of the public school fund of the county in which the land lay. It was further provided that settlement should be made with the several counties for moneys paid by the General Government to the State on account of unauthorized sales by the United States of portions of these swamp lands, and on account of settlement by the United States pre-emptors.

The said act of March 10, 1869, supra, by the first section thereof, threw an illuminating light upon what has been said above touching the delay by the State to make the counties patents for these swamp lands. For it will be noted that it says, ''In order to convey to the different counties in the State of Missouri a complete title to all the swamp and overflow lands, which were granted and have been patented to

the State of Missouri by an act of Congress . . . *the Register of Lands is hereby directed to prepare a patent or patents, embracing all the swamp or overflow lands, lying within the limits of the several counties of this State, conveying thereby all title and interest of the State of Missouri in and to such lands to the counties in which such lands may lie.''* .And which patents when prepared were required to be signed by the Governor, attested by the Secretary of State and recorded with the Register of Lands in his office.  But for the reasons above suggested, it would otherwise seems queer that such patents had not theretofore been issued, for this act was passed, as stated, on March 10, 1869.  It repealed all inconsistent acts and provisions, and when read in connection with the act of March, 1868, supra, has had the effect of practically crystallizing the statutory swamp land law of this State.  Pursuant to the act of March 1, 1855 (Laws 1854-5, supra), the several registers of swamp lands and the several receivers of public moneys in the southeastern group, whether such officers were registers and receivers, respectively, *ex-officio,* as they were in some counties in this group, or whether they were elected, proceeded to make sales of these lands and to attend to their duties as required by said act. The lands being then held to be practically valueless, these sales were slow, except when reclamation scrip could be ''located'' on them.  There were in many of these counties more than three hundred thousand acres of these swamp lands, embracing many thousands of different tracts, according to the smallest government subdivision.  This fact made necessary the keeping of books, wherein there were set down the number of the swamp land scrip offered in payment for the land, the name of the purchaser of the land, the description of the land, the price thereof, the aggregate number of acres of such land purchased,

261Mo4

and the aggregate price paid therefor. This was a matter of absolute necessity, otherwise it would have been impossible to have performed any of the duties made incumbent upon these two officers in an intelligent way. These books, which were usually designated as the "Register's Book" and the "Receiver's Book," were kept in the offices of such officers and in the offices of the treasurer and county clerk, where these two latter officials were receivers and registers of swamp lands, ex-officio, respectively. When these officers—the receiver of public moneys and the register of swamp lands—were put legally out of office by the acts of 1868 and 1869, supra, their books and the records kept by them passed into the custody of the county clerks of the several counties of the southeastern group for the most part. It may be said in passing, as a matter of history, that the Civil War put these two offices and officers in practically all counties in the southeastern group, out of commission for a time, and that from the beginning of the Civil War until the passage of the acts of 1868 and 1869 above referred to abolishing their offices, none of them in fact performed any of the duties incumbent on them by statutes. In some of the counties, as for example, Pemiscot county, the books kept by these officials were saved from loss by war, almost by a miracle, only to pass for a long period by the catastrophe of fire, as an incident of the burning of the courthouse therein in 1882, into the hands of private persons and were by these private persons for many years retained.

The interesting details of the vicissitudes to which the "Register's Book" and the "Receiver's Book" of Pemiscot county, have been subjected is to be gathered in shreds and patches from the vast number of cases coming here from that county involving swamp land titles, and may be placed together into a fairly consistent history. When the courthouse of

that county was destroyed by fire in 1882, both the "Register's Book" and the "Receiver's Book" were temporarily out of the custody of the clerk of the county court. He had permitted Hon. George W. Carleton, a lawyer and abstracter, resident at Gayosa, the then county seat, to borrow and to take these books out of their usual custody, for a short time, in order that entries therefrom might be copied into Carleton's abstract. While the books were in the custody of Carleton, the courthouse, with all records of land titles, court records and records of whatever sort, was destroyed by fire. These books remained in Carleton's hands thereafter, almost forgotten, till his death, in 1893, when they passed to his heirs as if assets of his estate and were sold by the administrator or by his heirs, just as if they had been in fact Carleton's property. Subsequently, and in very recent years, the purchasers of the two books have again placed them in the custody of the county clerk of Pemiscot county.

Many special acts of the Legislature, passed throughout the years before the Constitution of 1875, permitting Pemiscot, Dunklin and other of the southeastern group to donate portions of the swamp lands therein to railroads, toll roads, plank roads and other corporations, have not been noticed. They are not pertinent to the matter now in hand. Likewise some special provisions affecting the minimum price at which swamp lands in Dunklin and counties other than Pemiscot could be sold, are passed over as not pertinent, till a swamp land title with this point of minimum price in it, shall come up from these counties. [See Act of Jan. 30, 1857, Laws 1856, p. 464.]

Such in brief is the history of swamp land legislation affecting the title to such lands in the southeastern group in general and in Pemiscot county, Dunklin county and Scott county more particularly.

After this historical diversion I return to the subject in hand. It will be seen that the Act of 1901, Laws

1901, page 251, known as the "Carleton Act," made the abstracts he had prepared from Register's and Receiver's books, prima-facie evidence of land titles in Pemiscot county. (That act, by the way, has been declared unconstitutional by this and the Federal courts, which rulings led to the enactment of the Act of 1907, Laws 1907, page 271, remedying the vice of the former act.)

It stands to reason, that if Carleton's Abstract was admissible in evidence under either of said acts, and counsel for respondent insists it was, then under and by virtue of the well-known rules of evidence the original books in the hands of Mr. Brewer, from which the abstract was made, were also admissible because they were the best evidence, the original being always the best.

We are, therefore, clearly of the opinion that the court did not err in admitting the original books.

We had occasion to review this law somewhat extensively in the case of Mosher v. Bacon, 229 Mo. 338, and there we considered the act of the Legislature creating the offices of the register and receiver of swamp lands, in the counties therein mentioned, their duties, the mode of selling those lands, and the books they were required to keep, and what they should show, etc. After so doing we held that when a purchaser had fully complied with all of the provisions of said laws, and paid the purchase price for the lands entered, and received the receipts of said officer therefor, as therein provided for, he thereby acquired the equitable title to the land so entered and paid for, notwithstanding, through the fault of the officers of the State or county, he never received a patent therefor as prescribed by the act; also, that the Register's and Receiver's books required to be kept by said act were notice to the world that the county had sold the lands shown thereby, and that if any

one subsequently purchased them again he did so at his peril.

It was also there held that said equitable title was superior to and better than the legal title subsequently acquired from the county. The law as announced in that case, is controlling in this. But the application of that principle of law to this is not absolutely necessary for appellants' right to recover here, because William G. Easley was the common source of title through whom both parties to this suit claim title, which forecloses all necessity to make inquiry into said Easley's title.

II. Counsel for appellant contends that the judgment of the circuit court should be reversed for the reason that the record shows affirmatively that the respondent has no title whatever to the land in controversy, for the reason that the tax judgment against William G. Easley, under which the respondent claims title, was rendered March 15, 1879; that the execution thereunder was issued September 8, 1879; that the execution was delivered to the sheriff September 10, 1879; that the sheriff's levy was made on the same day; and the sale thereunder of tract No. 2, the north half of the northeast quarter of section eighteen, township seventeen, range eleven, etc. (the remaining part of the land sued for was not sold) was made November 4, 1879.

*Taxation Against Vendor.*

The evidence also shows that the appellant derived his title through William G. Easley through mesne conveyance. He conveyed the land to his son, James B. Easley, by deed dated April 13, 1873, duly recorded April 14, 1873. This evidence shows that William G. Easley, the defendant in the tax suit, under which both the respondent and appellant claim title, had disposed of the land to his son James some six years before the tax suit was instituted, the judgment

rendered or sale made thereunder. That being true the judgment and the sale of the land thereunder were absolute nullities, in so far as James and those who claim through him are concerned.

This alone is sufficient to justify a reversal of the judgment of the circuit court.

But there is another equally valid reason why the judgment should be reversed, and that is, the deed shows that that part of the land which was sold was sold on November 4, 1879, at the November term of said court.

This court takes judicial notice of the terms of the various circuit courts of the State, as they are established by public statutes. From 1871 to a date subsequent to the date of this sale, the terms of the Pemiscot Circuit Court began on the "second Monday of March and September" of each year. From this it is seen that there was no such term as the November term of the circuit court of Pemiscot county in the year 1879, when the sale took place.

And sections 2380 and 6838, Revised Statutes 1879, the same as our present statutes, required all such sales to be made during the term of the circuit court.

It thus appearing that the sale did not take place during a term of the circuit court, it necessarily follows that the sale was also void on that account as this court has repeatedly held. But independent of the two defenses just mentioned, the record shows that the sheriff only sold the north half of the northeast quarter of section eighteen, township seventeen, range eleven, and did not pretend to sell the northeast quarter of section eight, township seventeen, range eleven.

Under this showing the respondent had no color of title whatever to this one hundred and sixty acres,

III.   Respondent also interposed the defenses of the Statute of Limitations, and estoppel.

After a careful reading of this entire record, which is not unusually long, we fail to find a scintilla of evidence preserved tending to support either of those defenses, but upon the other hand the evidence shows that the lands were wild, swamp-timber lands uncultivated and in the possession of no one.

Under these views of the case, we are of the opinion that the judgment of the circuit court should be reversed, and that a judgment should be here rendered in favor of appellant in accordance to the prayer of the petition.

It is so ordered.   All concur.