## THE YOSEMITE VALLEY CASE.

### [HUTCHINGS v. LOW.]

1. A party by mere settlement upon lands of the United States, with a declared intention to obtain a title to the same under the pre-emption laws, does not thereby acquire such a vested interest in the premises as to deprive Congress of the power to divest it by a grant to another party.
2. The power of regulation and disposition over the lands of the United States conferred upon Congress by the Constitution, only ceases under the pre-emption laws when all the preliminary acts prescribed by those laws for the acquisition of the title, including the payment of the price of the land, have been performed by the settler.   When these prerequisites have been complied with, the settler for the first time acquires a vested interest in the premises occupied by him, of which he cannot be subsequently deprived.   He then is entitled to a certificate of entry from the local land officers, and ultimately to a patent for the land from the United States.   Until such payment and entry the pre-emption laws give to the settler only a privilege of pre-emption in case the lands are offered for sale in the usual manner; that is, the privilege to purchase them in that event in preference to others.

3. The United States by the pre-emption laws do not enter into any contract with the settler, or incur any obligation that the land occupied by him shall ever be put up for sale. They simply declare by those laws that in case any of their lands are thrown open for sale the privilege to purchase them in limited quantities, at fixed prices, shall be first given to parties who have settled upon and improved them. The legislation thus adopted for the benefit of settlers was not intended to deprive Congress of the power to make any other disposition of the lands before they are offered for sale, or to appropriate them to any public use.

4. The case of *Frisbie* v. *Whitney* (9th Wallace, 187), affirmed.

5. The case of *Lytle* v. *The State of Arkansas* (9th Howard, 333), explained and distinguished from the present case.

6. The act of Congress of June 30th, 1864, granting the Yosemite Valley and the Mariposa Big Tree Grove to the State of California passed the title of those premises to the State, subject to the trust specified therein, that they should be held for public use, resort, and recreation, and be inalienable for all time.

ERROR to the Supreme Court of California; the case being thus:

On the 30th of June, 1864, Congress passed an act,* granting to the State of California the cleft, or gorge, in the Sierra Nevada Mountains, situated in the county of Mariposa in that State, known as the Yosemite Valley, with its branches and spurs, in estimated length fifteen miles, and in width one mile, with the stipulation that the State should accept the grant upon the express condition that the premises should be held for public use, resort, and recreation, and should be inalienable for all time, except that leases for portions of the premises for periods not exceeding ten years might be made, the income derived therefrom to be expended in the preservation and improvement of the premises, or the roads leading thereto. The act provided that the boundaries of the grant should be established, at the cost of the State, by the Surveyor-General of the United States for California, whose official plat, when affirmed by the Commissioner of the General Land Office, should constitute the evidence of the *locus*, extent, and limits of the cleft, or gorge; and that the premises should be managed by the governor of the State, with eight other commission-

---

* 13 Stat. at Large, 325.

ers to be appointed by him, who should receive no compensation for their services.

By the same act Congress also granted to the State the tract of land embracing the grove of mammoth trees in Mariposa, known as "the Mariposa Big Tree Grove," the grant to be accepted upon similar conditions as the grant of the Yosemite Valley, and the premises to be held for like public use, resort, and recreation, and to be also inalienable for all time, but with the same privilege as to leases.

At the first session of the legislature of California, subsequently held, an act was passed by which the State accepted the grant thus made of the Yosemite Valley and Big Tree Grove, upon "the conditions, reservations, and stipulations" contained in the act of Congress, and the governor and eight commissioners, who had previously been appointed by him during the recess of the legislature, were constituted a board of commissioners, "with full power to manage and administer the grant made, and the trust created by the act of Congress," and to make rules and regulations for the government, improvement, and preservation of the premises. The act also provided for the appointment by the commissioners of a guardian of the premises, and made it a penal offence in any one to commit wilfully any trespass thereon, to cut down or girdle the trees, to deface or injure the natural objects, to fire the wood or grass, or to destroy or injure any bridge or structure thereon, or other improvement.

On the 19th of May, 1864, six weeks previous to the passage of the act of Congress making the grant to the State, Hutchings entered the valley of the Yosemite and settled upon lands therein, with the intention, according to his declarations, and the findings of the court, to acquire the title to the same under the pre-emption laws of the United States. There were then on the premises a house, outhouses, and a fence inclosing about three acres. These improvements Hutchings purchased of the previous occupant, and he had ever since resided upon the premises, and had improved and cultivated them. The valley at the time was unsurveyed, and no other acts than the settlement thus

made and continued had ever been done by him to acquire the title, unless soliciting the State and Congress to recognize his claim can be called such acts. At the time of his settlement, Hutchings was possessed of all the qualifications required of settlers under the pre-emption laws of the United States.

The principal one of these laws, and the one to which all subsequent acts refer, is the act of September 4th, 1841,* entitled "An act to appropriate the proceeds of the sales of the public lands, and to grant pre-emption rights." The tenth section of this act provides that any person of the class designated therein, who shall make a settlement upon the public lands, to which the Indian title has been extinguished, and *which has been previously surveyed*, and shall inhabit and improve the same, and shall erect a dwelling thereon, shall be authorized to enter with the register of the proper land office, by legal subdivisions, one quarter section of land, to include the residence of the claimant, upon paying to the United States the *minimum price* of said land, subject to certain specified exceptions, among which is that no lands included in any reservation by any treaty, law, or proclamation of the President, or reserved for salines, or for the support of schools, or *for other purposes*, shall be liable to entry. By other sections various provisions are enacted for the determination of conflicting claims, and the preservation of proofs of settlement and improvement. When all the prerequisites are complied with, and the claimant has paid the price of the land, he is entitled to a certificate of entry from the register and receiver, and after a reasonable time to enable the land officers to ascertain whether there are any superior claims, and whether the claimant has complied, in all respects, with the law, he is entitled to a patent of the United States.†

By the sixth section of the act of Congress of March 3d, 1853, entitled "An act to provide for the survey of the public lands in California, the granting of pre-emption rights there-

---

* 5 Stat. at Large, 453.

† See opinion of Mr. Justice Miller, 9 Wallace, 194.

in, and for other purposes,"* all the public lands of the United States in California, *whether surveyed or unsurveyed,* are made, with certain exceptions, subject to the above act of September 4th, 1841, " with all the exceptions, conditions, and limitations therein," with a proviso that when unsurveyed lands are claimed by pre-emption notice of the claim shall be filed within three months after the return of the plats of surveys to the land offices, and proof and payment shall be made prior to the day appointed by the President's proclamation for the commencement of the sale including such lands ; the entry of such claims to be made by legal subdivisions according to the United States survey ; and also that settlement on unsurveyed lands shall be authorized only where the settlement is made within one year after the passage of the act.    This last limitation was subsequently extended by act of Congress two years from March 1st, 1854.†

In some of the States and Territories, by acts of Congress, settlements are authorized on unsurveyed lands, and by the 7th section of the act of May 30th, 1862, " to reduce the expenses of the survey and sale of the public lands of the United States,"‡ this privilege was extended to California.

Under this last act, Hutchings conceived that he had a right to settle upon the unsurveyed lands of the United States in the Yosemite Valley, and by the above acts of 1841 and 1853 could acquire and had acquired such a vested interest in the premises, to the extent of one hundred and sixty acres, that the United States could not transfer their title to the State, or dedicate the land to any public use.    He therefore refused to surrender the possession to the commissioners appointed by the State.    The defendant also refused to take a lease from the commissioners, though offered to him at a mere nominal rate for ten years.    They accordingly, in November, 1867, brought the present action, alleging in their complaint that the State was owner in fee of the premises, and that they were entitled to the possession as commissioners of the State.

---

* 10 Stat. at Large, 246.        † Ib. 268.        ‡ 12 Id. 410.

Pending the action, and on the 20th of February, 1868, the legislature of California passed an act granting to the defendant and one Lamon, each, one hundred and sixty acres of land in the Yosemite Valley; the part granted to the defendant containing his improvements and the premises in controversy. The second section of the act provided that the act should take effect from and after its ratification by Congress. It had never been thus ratified. A bill to ratify it passed the House of Representatives, but failed in the Senate.

The District Court of the State, in which the action was commenced, adjudged that the defendant was right in his view of his interest, and accordingly gave judgment in his favor. The Supreme Court of the State reversed the judgment, and ordered judgment for the possession of the premises in favor of the commissioners. The defendant now brought the case here for review.

*Mr. G. W. Julian, for the plaintiff in error:*

The question is, whether Congress, in granting the valley to the State of California, could divest the right of Hutchings under the pre-emption laws? In other words, had Hutchings such a vested right or interest, that Congress could not divest it by the grant of it to another party?

The case of *Lytle v. The State of Arkansas** is in point. There Cloyes, the pre-emptor, selected his claim under the act of Congress of May 29th, 1830, authorizing and regulating pre-emptions. A later act, dated June 15th, 1832, granted to the Territory of Arkansas one thousand acres for a court-house and jail at Little Rock, including the tract claimed. Before this grant the pre-emption right of Cloyes had accrued under the act of 1830, and he had proved his right, and done everything he could do to perfect it. The court says:

" By this grant to Arkansas, Congress could not have intended to impair vested rights. The grants of the one thousand acres

---

* 9 Howard, 333.

and of the other tracts must be so construed as not to interfere with the pre-emption of Cloyes."

This case is referred to in the case of *Barnard* v. *Ashley.*[*] The court says:

"In Lytle's case we declared that the occupant was wrongfully deprived of his lawful rights of entry under the pre-emption laws, and the title set up under the selection of the governor of Arkansas was decreed to Cloyes, the claimant: this court holding his claim to the land to have been a legal right by virtue of the occupancy and cultivation, subject to be defeated only by a failure to perform the conditions of making proof and tendering the purchase-money."

This, it will be seen, deals with the right of pre-emption as "a legal right, by virtue of the occupancy and cultivation" of the pre-emptor, "subject to be defeated *only* by a failure to perform the conditions of making proof and tendering the purchase-money."

The court adds:

"The claim of pre-emption is not that shadowy thing which by some it is considered to be. Until sanctioned by law it has no existence as a substantive right; but when covered by the law, it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it."

If this is true of Cloyes, it must be equally true of Hutchings, and he can only lose his claim "by a failure to perform the conditions annexed to it," when those conditions shall be tendered for his performance. In giving the opinion in *Lytle* v. *The State of Arkansas*, the court says:

"The adventurous pioneer, who is found in advance of our settlements, encounters many hardships, and not unfrequently dangers from savage incursions. He is generally poor, and it is fit that his enterprise should be rewarded by the privilege of purchasing the favorite spot selected by him, not to exceed one hundred and sixty acres. That this is the national feeling, is shown by the course of legislation for many years."

* 18 Howard, 43.

This expresses the spirit and policy of the pre-emption laws, as they have been understood by the whole country till quite recently. The pioneer settler has been treated as the favorite of the law. The court says further:

"It is a well-established principle, that when an individual, in the prosecution of a right, does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him. In this case the pre-emptive right of Cloyes having been proved, and an offer to pay the money for the land claimed by him, under the act of 1830, nothing more could be done by him, and nothing more could be required of him under that act. And subsequently, when he paid the money to the receiver, under subsequent acts, the surveys being returned, he could do nothing more than offer to enter the land, which the register would not permit him to do. This claim of pre-emption stands before us in a light not less favorable than it would have stood if Cloyes or his representatives had been permitted by the land officers to do what, in this respect, was offered to be done."

Cloyes was held excused, on the ground that he had done everything in his power to perfect his claim. Hutchings did the same. Cloyes had gone further in complying with the conditions of title than Hutchings has done, but each went as far as he could, and neither was in default. The good faith of the government is involved in both cases. There is no justice in the argument that the pre-emptor, after having made valuable improvements, and expended his money thereon, and complied with all the conditions of title which were within his power, may nevertheless be driven from his possession, his improvements confiscated, and the land conveyed to another, with notice of all the facts, who can hold it discharged from all the equities of the pre-emptor.

It is conceded on all hands, that if a pre-emptor, in addition to the other acts required of him, has *paid* for the land, he has acquired a vested right to it, and the government is bound to give him the title; but this concession yields the whole case. If the government is bound by its good faith

to protect the settler at one stage of his claim, and as to one condition of title, it is bound to protect him at all stages, and as to every condition.   The condition of final payment is no more vital or sacred, either to the settler or the government, than any of those which precede it.   In the language already quoted, " it is fit that his enterprise should be rewarded by the privilege of purchasing the favorite spot selected by him, not to exceed one hundred and sixty acres;" but of what value is this " privilege," if the settler holds it at the mere will of the government, which may cut it off at any moment?   And what must be thought of a government which holds its individual citizens to perfect good faith, by compelling them to perform their engagements, and yet violates its own faith to the settler, that he should have a home on its lands on specified conditions, with which he is ready and willing to comply?   Nor is this question answered by saying that the settler has the option to abandon his pre-emption at any time, and that the government, therefore, should be equally free.   The option of the pre-emptor is properly given by the law; for if he abandons his claim, the land, with the improvements made upon it, reverts to the government, which loses nothing.   The transaction has been likened to a contract for the sale of lands, in which the owner retains the title as security for the purchase-money. On the other hand, if the settler, after spending his money and his time in improving his pre-emption, and making for himself a home, as in the present case, is driven away by the government, without any default on his part, he loses all unjustly, and is without remedy.

This case of *Lytle* v. *The State of Arkansas* deserves particular regard, not only because the principles laid down in it settle the case under consideration in favor of Hutchings, but because it sustains the true land policy of the nation, as universally understood, till within a very recent period.

The counsel on the other side will rely on *Frisbie* v. *Whitney;** the only authority of any Federal court which

* 9 Wallace, 187.

can be cited in favor of the doctrine now set up as to the rights of settlers under the pre-emption laws. The case is in the face of the explicit language of the court in the case of *Lytle* v. *The State of Arkansas*, of which, however, it takes no notice. It is against the current of authorities on the question in the Federal courts, and against the whole spirit and policy of our land laws. It refers to the different sections of the pre-emption act of 1841, but takes no notice of the judicial constructions of the act in favor of the rights of the settler under that act. It cites in support of the points affirmed sundry opinions of attorneys-general and decisions of State courts, which at best are not binding and conclusive authorities in this court; while it fails to discuss or scarcely to refer to the strong cases decided in the Federal courts in favor of an opposite interpretation of the right of pre-emption.

The facts also of the case of *Whitney* v. *Frisbie* are peculiar; and the claim of Hutchings cannot be held as conclusively settled adversely, to our view, by that single case.

*Mr. E. L. Goold, contra.*

Mr. Justice FIELD, after stating the case, delivered the opinion of the court, as follows:

The simple question presented for determination is whether a party, by mere settlement upon lands of the United States, with a declared intention to obtain a title to the same under the pre-emption laws, does thereby acquire such a vested interest in the premises as to deprive Congress of the power to divest it by a grant to another party. If such be the effect of mere settlement, with a view to pre-emption, upon the power of Congress to grant the lands occupied to another party, it must operate equally to deprive Congress of the power to reserve such lands from sale for public uses of the United States, though needed for arsenals, fortifications, lighthouses, hospitals, custom-houses, court-houses, or for any other of the numerous public purposes for which property is used by the government. It would require very clear

language in the acts of Congress before any intention thus to place the public lands of the United States beyond its control by mere settlement of a party, with a declared intention to purchase, could be attributed to its legislation.

The question here presented was before this court, and was carefully considered, in the case of *Frisbie* v. *Whitney*, reported in the 9th of Wallace.   And it was there held that under the pre-emption laws mere occupation and improvement of any portion of the public lands of the United States, with a view to pre-emption, do not confer upon the settler any right in the land occupied, *as against the United States*, or impair in any respect the power of Congress to dispose of the land in any way it may deem proper; and that the power of regulation and disposition, conferred upon Congress by the Constitution, only ceases when all the preliminary acts prescribed by those laws for the acquisition of the title, including the payment of the price of the land, have been performed by the settler.   When these prerequisites have been complied with, the settler for the first time acquires a vested interest in the premises occupied by him, of which he cannot be subsequently deprived.   He is then entitled to a certificate of entry from the local land officers, and ultimately to a patent for the land from the United States.   Until such payment and entry the acts of Congress give to the settler only a privilege of pre-emption in case the lands are offered for sale in the usual manner; that is, the privilege to purchase them in that event in preference to others.   The United States by those acts enter into no contract with the settler, and incur no obligation to any one that the land occupied by him shall ever be put up for sale.   They simply declare that in case any of their lands are thrown open for sale the privilege to purchase them in limited quantities, at fixed prices, shall be first given to parties who have settled upon and improved them.   The legislation thus adopted for the benefit of settlers was not intended to deprive Congress of the power to make any other disposition of the lands before they are offered for sale, or to appropriate them to any public use.

The decision in *Frisbie* v. *Whitney* was pronounced by a unanimous court, and subsequent reflection has satisfied us of its entire soundness. The construction there given to the pre-emption laws is, as there stated, in accordance with the construction uniformly given by that department of the government, to which the administration of the land laws is confided, and by the chief law officers of the government to whom that department has applied for advice on the subject. It is the only construction which preserves a wise control in the government over the public lands, and prevents a general spoliation of them under the pretence of intended settlement and pre-emption. The settler being under no obligation to continue his settlement and acquire the title, would find the doctrine advanced by the defendant, if it could be maintained, that he was possessed by his settlement of an interest beyond the control of the government, a convenient protection for any trespass and waste, in the destruction of timber or removal of ores, which he might think proper to commit during his occupation of the premises.

The argument of the defendant's counsel, and his criticism upon the decision in *Frisbie* v. *Whitney* are founded upon a misapprehension of the language used in some previous opinions of this court, and particularly of language used in the opinion in the case of *Lytle* v. *The State of Arkansas*.* This last case and the language there used did not escape the attention of the court in the consideration of *Frisbie* v. *Whitney*. That and other cases, in which the equitable rights of persons claiming under the pre-emption laws had been protected against the legal title acquired by others in disregard of their rights, were cited by counsel and commented upon on the argument, as asserting principles inconsistent with the construction of those laws given by the court. But the court, without examining in the opinion the cases cited in detail, stated that in nearly all of them the party, whose equitable right was protected, had acquired a vested right by action of the land officers, and payment and

---

* 9 Howard, 333.

acceptance of the price of the land, which those officers had disregarded; and that in the other cases the successful party had established his legal right of preference of purchase over others under existing law; and that in these particulars those cases were widely different from that of *Frisbie* v. *Whitney*.

But inasmuch as counsel of the defendant,* who appeared also as one of the counsel in this last case, again urges upon our attention the case of *Lytle* v. *Arkansas*, and contends with much earnestness that it sustains principles in conflict with those expressed in *Frisbie* v. *Whitney*, and also settles the case at bar in favor of the defendant, we are induced to state at some length what that case was, and what it actually decided. In that case a pre-emptioner by the name of Cloyes claimed a right to make an entry of certain lands under the act of Congress of May 29th, 1830. That act gave to every occupant of the public lands prior to its date, who had cultivated any part thereof in the year 1829, a right to enter at the minimum price, by legal subdivisions, any number of acres not exceeding one hundred and sixty, including his improvements, provided the land was not reserved for the use of the United States, or either of the several States. It required, before any entries could be made, that proof of settlement or improvement by the claimant should be made to the satisfaction of the register and receiver of the land district, pursuant to rules prescribed by the Commissioner of the General Land Office. Under rules thus prescribed proof was made of the cultivation and improvement of Cloyes which was satisfactory to the register and receiver, and payment of the price was offered by him. Those officers held that he was entitled to enter one of the fractional sections claimed, the one upon which his improvement was made and not the others, and issued a certificate to him to that effect. The plats of the township.

* Mr. Julian's name was printed as one of the counsel to the brief filed for the defendant in *Frisbie* v. *Whitney*, though his name is not given in the report of the case in 9th Wallace, he not having participated in the oral argument.—REP.

where the land was situated not having been furnished by the surveyor-general, as required, the formal entry with the register could not be made, but in lieu thereof, under instructions of the Commissioner of the General Land Office, proof identifying the land claimed was allowed to be filed. The act of 1830 expired in one year, and the public surveys of the land were not completed until December, 1833, and were not returned to the land office until the beginning of 1834. Cloyes had thus done all that he could do to perfect his right to the title of the United States under a law which opened the land for sale in limited quantities, at specified prices, to its occupants and cultivators.

Subsequently, in July, 1832, Congress passed an act giving to parties entitled to pre-emption under the act of 1830 one year from the time when the township plats should be returned, to enter the lands. Under this act the heirs of Cloyes, he having died, made payment to the receiver for the fractional section to which his pre-emption claim was allowed in 1830, as already stated, and also for the fractional sections to which his claim was rejected, and applied to the register to enter them, but that officer refused to allow the entry. The court held that, so far as the fractional quarter section to which the claim was allowed by the register and receiver in 1830 was concerned, the refusal did not affect the right of the claimant. And it is with respect to the inability of Cloyes to make the entry in 1830 for want of the township plats which the surveyor-general had failed to return, and the refusal of the register to allow the entry subsequently under the act of 1832, that the language cited by counsel was used by the court; namely, that, "It is a well-established principle that when an individual, in the prosecution of a right, does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him. In this case the pre-emption right of Cloyes having been proved, and an offer to pay the money for the land claimed by him, under the act of 1830, nothing more could be done by him, and nothing more could be required of him under that act. And subsequently, when

he paid the money to the receiver, under subsequent acts, the surveys being returned, he could do nothing more than to offer to enter the land, which the register would not permit him to do. This claim for pre-emption stands before us in a light not less favorable than it would if Cloyes or his representatives had been permitted by the land officers to do what in this respect was offered to be done."

There is no question about the correctness of the doctrine here announced; it is only a familiar principle which is stated, that where one offers to do everything upon which the acquisition of a right depends, and is prevented by fault of the other side, his right shall not be lost by his failure.

The principle only applies where, by law or contract, the acquisition of a right is made dependent upon the performance of certain specified acts. There can be no such thing as the acquisition of a right of pre-emption, that is of a right to be preferred in the purchase of property of the United States, until such property is open for sale. In the case from Arkansas the law of 1830 authorized the entry and sale of the land to the occupants and cultivators; it prescribed certain things to be done to entitle them to purchase; these things were done, or would have been done by Cloyes if the officers of the government, appointed to aid in their performance, had not failed in their duty. The hindrance to the complete performance of everything required of the claimant could not impair his rights. And it was immediately after affirming the validity of his claim, notwithstanding this hindrance, that the court used the language upon which so much stress is placed by the defendant's counsel, to the effect that a claim of pre-emption is not a " shadowy right," but when covered by the law is a legal right, subject to be defeated only by a failure to perform the conditions annexed to it. This language was undoubtedly correct as applied to the claim of Cloyes, as then situated, which gave occasion to it, and it is in a general sense correct as applied to every claim of pre-emption. Such claim, it must be remembered, is only a claim to be preferred in the purchase of lands of the United States in limited quantities, at fixed prices, when the lands

are offered for sale in the usual manner. When one has acquired this claim by complying with the conditions of the law for its acquisition he has a legal right to be thus preferred, when the sale is made, as against others asserting a similar right under the law, which the court will enforce in proper cases. But the claim of pre-emption, as already said, can never arise when the law does not provide for a sale of the property. Until thus sanctioned by the law the claim, as stated by the court in that case, has no existence as a substantive right.

There is nothing in the case of the defendant which is at all analogous to that of Cloyes. Here the land occupied by the defendant was never offered for sale, but was excluded from any possible sale by appropriation to perpetual public use, resort, and recreation. Nothing was therefore required or could be required of the defendant for the acquisition of the title, and nothing could be, or was done by him to that end.

In the case from Arkansas, the right of Cloyes had been defeated by the failure of the executive officers to perform their duty under the law, he having complied fully with its provisions, except so far as he was prevented by such failure, and having thus acquired a right to the title of the government. In the present case no default on the part of the executive officers is alleged or pretended. The ground of complaint is that the defendant could not acquire the title under the pre-emption laws, because Congress had granted the land to the State and thus withdrawn it from sale. In the one case it is the action of the executive officers which is the ground of complaint; in the other it is the action of Congress.

The court cannot assume, and then found a decree upon the truth of the assumption, that the defendant would have complied with the provisions of the pre-emption laws, had Congress never made the grant. Nor could it make any such assumption, even if it were held that those laws surrendered unconditionally the entire public lands to settlers, instead of allowing to them the privilege of pre-emption provided the lands are offered for sale in the usual manner.

In June, 1832, Congress passed an act granting to the Territory of Arkansas one thousand acres of land contiguous to and adjoining the town of Little Rock, for the erection of a court-house and jail. The grant was not of any specific tract, but only of a specified quantity to be selected by the governor. Previous to the selection by him and previous to the grant, Cloyes had acquired a right, as already stated, to the title of the government. This was a vested right, and the court very properly held that Congress, in making the grant to Arkansas, did not intend to impair vested rights, and that the grant must be so construed as not to interfere with the pre-emption of Cloyes. No other ruling would have been consistent with settled principles. Had the lands in the Yosemite Valley been open for sale, and had Hutchings acquired a right to the title of the United States by complying with all the conditions upon which the acquisition of that title depended before the grant to the State, his position would have some analogy to that of Cloyes. His right to the title would then have been a vested right, and the grant to the State would have been construed so as not to interfere with his pre-emption. But his declarations as to what he would have done had the land not been withdrawn by Congress from the operation of the pre-emption laws, are unavailing for any purpose.

The case of *Lytle* v. *Arkansas* is confessedly the strongest case which counsel can cite in support of the anomalous views advanced by him. It is manifest from the statement we have made of the facts of that case, that neither the case itself nor the language used in the opinion of the court, when considered in connection with the facts, give the slightest countenance to those views; but that the decision of the court and the doctrines expressed in the opinion, are in entire harmony with the principles announced in *Frisbie* v. *Whitney*. The whole difficulty in the argument of the defendant's counsel arises from his confounding the distinction made in all the cases, whenever necessary for their decision, between the acquisition by the settler of a *legal right to the land* occupied by him as against the owner, the United States;

and the acquisition by him of a *legal right as against other parties to be preferred in its purchase,* when the United States have determined to sell. It seems to us little less than absurd to say that a settler or any other person by acquiring a right to be preferred in the purchase of property, provided a sale is made by the owner, thereby acquires a right to compel the owner to sell, or such an interest in the property as to deprive the owner of the power to control its disposition.

The act of California, of February, 1868, attempting to grant the premises in controversy to the defendant is, by its own terms, inoperative until ratified by Congress. No such ratification has ever been made, and it is not believed that Congress will ever sanction such a perversion of the trust solemnly accepted by the State.    JUDGMENT AFFIRMED.