## RICHARDSON v. MIDWEST REFINING CO.

(No. 1480; September 11, 1928; 270 Pac. 154)

(Rehearing Denied November 21st, 1928)

*George W. Ferguson,* for appellant.

*Frederick D. Anderson, A. C. Campbell, John B. Barnes, Jr.,* and *Kent S. Whitford,* for respondent.

*George W. Ferguson,* in reply.

RINER, Justice.

The action in which the record was made which is now before us on direct appeal was one instituted by plaintiff and appellant, hereinafter referred to as the ''plaintiff'' against the defendant and respondent, mentioned subsequently herein as the ''defendant,'' to recover alleged damages in the District Court of Natrona County, Wyoming. Plaintiff's amended petition, after alleging his residence in Natrona County, in this state, the corporate existence of defendant under the laws of the State of Maine, with due authority to operate in Wyoming, his ownership in fee and right to the exclusive peaceable possession of the West ½ of the NE ¼ of Section 21, T. 34, R. 79 West of the 6th P. M., sets out that on March 1, 1917, one Frank J. Smith made application through the United States Land Office at Douglas, Wyoming, to file on this land as a stock-raising homestead, as provided by the Act of Congress approved December 2, 1916 (39 St. at L. 862) ; that the application being granted on December 20, 1919, the law governing such entries having been duly complied with, patent was issued by the United States to the heirs and devisees of the said Smith on January 19, 1924, he having previously to that date died. It is also alleged by plaintiff that he, as sole devisee under Smith's will, became and is the sole owner of the land aforesaid, but notwithstanding this, defendant has unlawfully entered upon and taken possession of a strip of ground about one hundred feet wide extending across Section 21 already mentioned, in a northeasterly direction from a point *east* of the southeast corner thereof to its north boundary east of the northwest corner of the section, and containing about twelve acres; that upon this strip of ground the defendant has, without right, title or interest in the land, constructed and maintains through its agents oil and gas carrying pipe lines, all to the damage of plaintiff, for which recovery is prayed in the sum of $3,000.

Defendant's amended answer embraces four separate defenses, the first of which put in issue plaintiff's claim to the exclusive fee simple title to the land in controversy, and averred that the strip of land entered upon and possessed by it, as alleged by plaintiff, is held by defendant through a limited fee title thereto and that the patent issued to Smith's heirs and devisees by the United States is subject to such title. Its second defense pleads defendant's affirmative claim of title by reason of three separate right-of-way locations, each undertaken to be initiated under the Act of Congress approved May 21, 1896 (29 St. at L. 127) ; the same having been initiated and perfected either by it or its predecessors in interest prior to the time the land involved was opened to entry under the stock-raising homestead act on July 7, 1919. The amended answer's third defense is grounded upon an allegation that long prior to the plaintiff's acquiring any interest in the strip of land in question, the oil and gas carrying pipe lines had been constructed, while the fourth defense thereof pleaded the four years' Statute of Limitations in this state governing actions for trespass upon real property.

Plaintiff's reply denies generally the allegations contained in the defendant's amended answer.

The cause was tried before the court with a jury in attendance. Upon the conclusion of the introduction of evidence for both parties, upon defendant's motion, a verdict in its favor was directed by the court and thereon judgment was duly entered that plaintiff take nothing by his action and that defendant recover its costs. It is from this judgment plaintiff has prosecuted these proceedings for review.

The proofs introduced by the parties to the record stand undisputed so far as they disclose what they and their predecessors in interest did under certain Public Land Laws of the United States to establish their respective claims of title to this strip of land in dispute.

The vital issue on the trial, then necessarily was as to the legal consequences of what was thus done. This calls for construction of several of the public land laws of the United States as applied to the uncontroverted facts before us. The argued assignments of error are all, except one, aimed at this phase of the case. The excepted assignment relates to the action of the trial court in overruling a challenge for cause to a proposed juror, interposed at the inception of the trial, but as the jury's verdict was an instructed one, the error, if error there was, a point not necessary to decide, was harmless. There seems to have been some conflict in the proofs as to the amount of damages, though even this appears to be not very serious.

The controlling facts, as we find them in the record, appear to be these: On January 11, 1911, Articles of Incorporation of the Casper-Salt Creek Oil Refining and Pipe Line Company were filed in the office of the Secretary of State of Wyoming. On February 11, 1911, the Midwest Oil Company was incorporated under the laws of Arizona, and on the 18th of that month, it filed a certified copy of its articles of incorporation with the Secretary of State of Wyoming, as required by the laws of this state to enable a foreign corporation to transact business therein. The Directors of the Casper etc. Co. for the first year of its existence were also directors and officers of the Midwest Oil Company, two of them being respectively the President and Secretary of the Oil Company.

In June, 1911, officered as we have indicated, the Midwest Oil Company, with the express assent of the Casper etc. Company, commenced the construction of an oil pipe line extending from near Casper, Wyoming, to the Salt Creek Oil Field and across the West one-half of Section 21, T. 34, R. 79 West of the 6th P. M., the line being completed and put in operation the latter part of November, 1911. The Midwest Oil Company continued to operate this pipe line until in 1914, when it was taken over and has been since operated by the defendant, the latter re-

ceiving a conveyance thereof from the former under date of January 2, 1920.

On June 22, 1911, the Department of the Interior accepted the articles of incorporation of the Casper etc. Company and approved an application and map filed by it for a right of way for a pipe line under the Act of Congress of May 21, 1896 (29 St. at L. 127). Thereafter, on February 5, 1912, the company last mentioned filed in the United States Land Office at Douglas, Wyoming, an application, field notes and map for an amended right of way for a pipe line, and also a relinquishment of all its right, title and claim in the right-of-way grant to it of date June 22, 1911, said map showing both the right of way granted the company on June 22, 1911 and also the amended line. Under date of November 19, 1913, the amended map was approved by the Department of the Interior and the relinquishment above mentioned accepted, notification of its action in this behalf being given the local officers of the United States Land Office at Douglas, Wyoming, on November 25, 1913. The final right of way applied for as above embraced a strip of land fifty feet wide extending length-wise through all the land in dispute, such land being 96 feet in width and proceeding in a northeasterly direction completely across the west half of Section 21 aforesaid. The additional width of the land in controversy was caused by reason of the two other claimed pipe line rights of way of the defendant—presently to be mentioned—overlapping each other, and also the first asserted right of way already described.

On March 1, 1917, one Frank J. Smith, through the United States Land Office at Douglas, Wyoming, under the Act of Congress approved December 29, 1916 (39 St. at L. 862), generally known as the stock-raising homestead act, made application to file on the W½ of the NE¼ of Sec. 21, T. 34, R. 79 West of the 6th P. M., accompanying his application with a petition for the designation of the land as subject to an entry of this class. The application

was received by the local officers at the land office and suspended, as they were required to do by the law and the regulations of the department thereunder, pending action on the petition to designate the land as of the proper class for which an entry of this sort could be made.

The defendant, during the period November 1, 1917 to February 1, or 21, 1918, commenced and completed the construction of another pipe line designated in the record as a "three-inch pipe line." This line also extended across the west half of Section 21, part of the land included in Smith's application as above described. Meanwhile, on January 22, 1918, the necessary map, application for right of way, field notes, and other data required by the Department of the Interior under the Act of May 21, 1896, were filed in the Douglas United States Land Office, in such form that on July 25, 1918, the map was approved by the Secretary of the Interior as required by law. This right of way was based upon and covered the three-inch pipe line already mentioned.

Further, from January 1, 1918, to June 1 of that year, the defendant constructed and completed still another pipe line across the West Half of Section 21 and the strip of ground in dispute, placed it in operation, and has operated it ever since. On December 10, 1918, location map and application papers were filed by the defendant in the Douglas, Wyoming, United States Land Office relating to and grounded upon this last mentioned pipe line, and thereon such proceedings were had that on April 23, 1919, the Secretary of the Interior approved the map locating the right of way therefor as directed by the statute.

During the preceding month, to-wit, on March 8, 1919, Frank J. Smith died. Thereafter, and on July 7, 1919, the Department of the Interior acted favorably upon Smith's petition for designation of the land embraced in his application to file stock-raising homestead entry as above, but no notification of that fact was then sent out, as under the law and departmental regulations at least

ninety days were required to elapse before the applicant could be notified of his right to enter the land, this procedure being necessary to protect the rights under the statute of adjoining entrymen. On November 13, 1920, the local United States Land Office at Douglas was notified of Smith's death. His stock-raising homestead entry seems to have been finally allowed December 15, 1920. In the fall and winter of 1921, plaintiff built some fences upon the land and in 1923 the will of Frank J. Smith was presented by plaintiff to the District Court of Natrona County for probate, and ultimately a final decree of settlement of the estate was made on May 2, 1925. That decree adjudged plaintiff to be the sole devisee of Smith and by virtue thereof and of the public land laws of the United States, he claims his right to the property in controversy here. Patent for the land included in the Smith entry was issued January 19, 1924, to the heirs and devisees of Frank J. Smith, deceased. The patent makes no mention of the several rights of way applied for and approved as hereinabove described.

There are seven pipe lines upon the several rights of way claimed by the defendant. All but one of these were completed before September 11, 1922. Five of them are upon the right of way applied for by the Casper etc. Co., in 1912, the other two being upon the rights of way subsequently sought by defendant. No objections prior to the issuance of the patent seem to have been interposed by plaintiff to the construction work undertaken by defendant upon the land included within its several claimed rights of way. The plaintiff has regularly leased for grazing purposes the entire land claimed by him, including the strip in controversy, for $75 to $100 per year. Neither plaintiff nor his lessees have ever been prevented by defendant from going across the claimed pipe line rights of way or denied the right to move their herds of cattle or sheep across them from one part of the land to another, such rights of way being unfenced. It appears that defendant's agents go upon the

land embraced within the asserted rights of way to repair and maintain the several pipe lines as may be needed.

Briefly, the contention of the plaintiff as to the right of way approved by the Secretary of the Interior on November 19, 1913, upon the application of the Casper etc. Co. over which right of way a pipe line had been completed two years before by the Midwest Company, and under which defendant claims, is: While the company last mentioned built a pipe line over the lands in controversy, it never complied with the other requirements of Section 1 of the Act of May 21, 1896, supra, and hence acquired no rights; that while the Casper etc. Company filed a map for its desired right of way, there is no proof of filing its articles of incorporation and organization thereunder with the Secretary of the Interior, as required by the Act of Congress aforesaid; that there is no evidence of the location of the line; that it never constructed a line and hence forfeited its rights under Section 3 of the Act of May 21, 1896, if any such rights were acquired, and that there is no conveyance of its alleged rights to the defendant.

An examination of the record in this case discloses that it contains a certified photostatic copy of a letter to the Secretary of the Interior from the Commissioner of the General Land Office over the latter's personal signature, the original letter being in the department's files, to the effect that, on June 22, 1911, the Department of the Interior accepted the articles of incorporation of the Casper etc. Co. and had approved its application for a right of way for a pipe line under the Act of May 21, 1896. There are other certified photostatic copies of affidavits attached to or placed upon the application papers of the Casper etc. Co. for the right of way in question, the originals of which were duly placed on file with the Department of the Interior as hereinbefore indicated, which are to the effect that the company last mentioned was duly organized and was undertaking to transact business through officers claiming to represent it. Thus it would seem that

there were actually in the departmental files the necessary papers on behalf of this company to enable it to comply with the requirements of Section 1 of the Act of May 21, 1896, supra, relative to the right of way claimed by defendant through it. But however this may be, there is another and in our view conclusive answer to the contention that there is no proof here that the Casper etc. Co. obeyed the requirements of Section 1 of the Act aforesaid preliminary to securing the approval of the Secretary of the Interior of the map of its proposed right of way.

Counsel for the parties all concede, and we believe correctly, that the portions of the Act of May 21, 1896, the operative effect of which must be considered in the instant case, resemble closely the provisions of the Act of March 3, 1875 (18 St. at L. 482), generally known as the Railroad Right of Way Act. The decisions of the federal court of last resort under these provisions of the statute just mentioned are necessarily strongly persuasive as to the operative force to be given the law now before us for consideration, which does not appear ever to have been before the courts for construction. In Great Northern Railway Co. v. Steinke, 261 U. S. 119, 67 L. Ed. 564, 43 Sup. Ct. Rep. 316, Mr. Justice Van Devanter, in discussing the effect to be given the railway right of way act, upon the due approval of a map of location thereunder, said:

"There is no provision in the act for the issue of a patent, but this does not detract from the efficacy of the grant. The approved map is intended to be the equivalent of a patent defining the grant conformably to the intendment of the act (Noble v. Union River Logging R. Co., 147 U. S. 165, 13 Sup. Ct. 271, 37 L. Ed. 123), and to relate back, as against intervening claims, to the date when the map was filed in the local land office for transmission through the General Land Office to the Secretary of the Interior (Stalker v. Oregon Short Line R. R. Co., 225 U. S. 142, 32 Sup. Ct. 636, 56 L. Ed. 1027)."

As the approved map is the equivalent of a patent from the Government, the language of the United States Supreme Court must also be invoked to define and make clear the effect and presumptions attendant upon the issuance by the proper officers of the Government of a patent to the public lands of the nation. In the early case of Hoofnagle v. Anderson, 7 Wheat, 212, 214, 215, 5 L. Ed. 437, 438, Chief Justice Marshall said:

"It is not doubted that a patent appropriates land. Any defects in the preliminary steps which are required by law are cured by the patent. It is a title from its date, and has always been held conclusive against all those whose rights did not commence previous to its emanation * * *. If the patent has been issued irregularly, the government may provide means for repealing it; but no individual has a right to annul it."

In St. Louis Smelting, etc. Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875, the court, in speaking of the execution of a patent by the officers charged with the duty under the law of issuance thereof, said:

"The execution and record of the patent are the final acts of the officers of the government for the transfer of its title, and as they can be lawfully performed only after certain steps have been taken, that instrument, duly signed, countersigned and sealed, not merely operates to pass the title, but is in the nature of an official declaration by that branch of the government to which the alienation of the public lands, under the law, is intrusted, that all the requirements preliminary to its issue have been complied with. The presumptions thus attending it are not open to rebuttal in an action at law."

And the court, in the same opinion, holding that the trial court erred in admitting the record of the proceedings upon which a patent had been issued in order to impeach its validity, remarked further:

"The judgment of the department upon their sufficiency was not, as already stated, open to contestation. If in issuing a patent its officers took mistaken views of the law, or drew erroneous conclusions from the evidence, or acted from imperfect views of their duty, or even from corrupt motives, a court of law can afford no remedy to a party alleging that he is thereby aggrieved. He must resort to a court of equity for relief, and even there his complaint cannot be heard unless he connect himself with the original source of title, so as to be able to aver that his rights are injuriously affected by the existence of the patent; and he must possess such equities as will control the legal title in the patentee's hands. Boggs v. Merced Mining Co., 14 Cal. 279, 363. It does not lie in the mouth of a stranger to the title, to complain of the act of the government with respect to it. If the government is dissatisfied it can, on its own account, authorize proceedings to vacate the patent or limit its operation."

In the subsequent case of Diamond Coal & Coke Co. v. United States, 233 U. S. 236, 34 Sup. Ct. Rep. 507, 58 L. Ed. 936, it was also said:

"The respect due to a patent, the presumption that all the preceding steps required by law were duly observed, and the obvious necessity for stability in titles resting upon these official instruments, require that in suits to annul them the government shall bear the burden of proof and shall sustain it by that class of evidence which commands respect, and that amount of it which produces conviction."

Applying these principles to the case in hand, it is, we think, clear that it must be presumed that all antecedent steps, as required by law and the departmental regulations, were taken by the Casper etc. Co. when the Secretary of the Interior endorsed his approval upon that company's map of location of the pipe line right of way, thereby constituting that document the "equivalent of a patent." It is further to be noted that at the time the Secretary approved the map of location of the pipe line,

on November 19, 1913, both plaintiff and his devisor Smith were utter strangers to the title thus granted, and, being so, under the rule of law declared by the Federal Supreme Court as quoted above, can be in no position to complain here of that title.

But it is said that the Casper, etc. Co. never built a pipe line upon this right of way and consequently, under Section 3 of the Act of May 21, 1896, forfeited any right it held by virtue of the approved map of location. The proof before us is that the Midwest Oil Company, a corporation possessing as part of its executive board and governing officials all the directors and officers of the Casper, etc. Co., built a pipe line upon the land covered by the proposed right of way with the express assent of the latter company. While this construction work was being carried on by the Midwest Oil Company, the Casper, etc. Company's application for a right of way was at the same time being prosecuted to final approval before the Department. We are unable to see why a company which procures a right of way for a pipe line from the Government under the Act under consideration and at the same time procures another corporation in which its officers and stockholders are interested to actually build and complete the pipe line upon the proposed right of way, has failed to obey the mandate of the statute. If, as here, the defendant by due conveyance has been substituted for the Midwest Oil Company, what person can complain if the owner of the right of way does not? The Government has not seen fit to attack what appears to be a business arrangement, doubtless satisfactory to all concerned.

The estate granted by the approval of the right of way is a limited fee, carrying with it the incidents and remedies usually attending the fee. Rio Grande Western Railway Company v. Stringham, 239 U. S. 344, 60 L. Ed. 136, 36 Sup. Ct. Rep. 5. This being so, the language of Mr. Justice Field in the case of Schulenberg v. Harriman, 88 U. S. 44, 22 L. Ed. 551, is pertinent:

"And it is settled law that no one can take advantage of the non-performance of a condition subsequent annexed to an estate in fee, but the grantor or his heirs, or the successors of the grantor if the grant proceed from an artificial person; and if they do not see fit to assert their right to enforce a forfeiture on that ground, the title remains unimpaired in the grantee. The authorities on this point, with hardly an exception, are all one way from the Year Books down. And the same doctrine obtains where the grant upon condition proceeds from the government; no individual can assail the title it has conveyed on the ground that the grantee has failed to perform the conditions annexed."

To the same effect is the case of Van Wyck v. Knevals, 106 U. S. 360, 367, 27 L. Ed. 201, 203, 1 Sup. Ct. Rep. 336.

The plaintiff, therefore, as the law seems to be, cannot invoke a fortfeiture which has never been asserted by the only party which had the power to declare it, i. e., the United States Government. Our conclusion is, then, that the defendant's pipe line right of way claimed through the Casper, etc. Co. and the Midwest Oil Co., is paramount to any right obtained by plaintiff through the patent upon which he relies.

Concerning the remaining two pipe line rights of way applied for by, and approved by the Secretary of the Interior in favor of, the defendant, it is objected that there is no proof in the record that sundry preliminary matters, such as the proper incorporation and organization of the defendant and the location of ten miles of pipe line, were before the Department when it granted defendant these several rights of way. But as the map of location presented by the defendant in the case of each of these two pipe line rights of way was approved as required by law, and proper proof of the fact is before us, what has hereinbefore been said concerning the effect to be given such approved map of location disposes of this contention.

Finally it is urged that, as these two last mentioned rights of way were granted after Frank J. Smith presented his

stock-raising homestead application papers to the United States Land Office at Douglas, Wyoming, though before the land was designated by the Secretary of the Interior as of the class subject to such entry, and though before such entry was allowed in said land office, the stock-raising homestead patent ultimately granted upon such entry to the heirs or devisees of Smith on January 19, 1924, must prevail and these several rights of way are of no effect as against it.

The disposition of this contention necessarily involves an examination of the legal effect to be given certain phraseology appearing in the pipe line right of way act and also in the stock-raising homestead statute already mentioned. The operative effect of these two statutes must likewise be considered. The Pipe Line Act (29 St. at L. 127) provides in part, in Section 1 thereof:

"The right of way through the public lands of the United States situate * * * in the State of Wyoming * * * is hereby granted to any pipe line company or corporation * * * to the extent of the ground occupied by said pipe line and twenty-five feet on each side of the center line of the same."

Section 2 of the Act, after providing that a company desiring to obtain the benefits of the statute shall in apt time file in the proper land office a map of its line, declares that:

"upon the approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office, and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way."

The Stock-raising Homestead Act (39 St. at L. 862) provides in Section 1 thereof that any person qualified to make entry under the homestead laws of the United States may make a stockraising homestead entry for not ex-

ceeding 640 acres of unappropriated public lands, provided, however:

"that the land so entered shall theretofore have been designated by the Secretary of the Interior as 'stockraising lands.' "

Section 2 of this Act, after authorizing the Secretary of the Interior to designate lands as subject to entry under the Act, "the surface of which is, in his opinion," chiefly valuable for grazing and raising forage crops, which have no merchantable timber, cannot be irrigated from any known source of water supply, and would reasonably require 640 acres to support a family, provides that when a qualified person makes an application to enter undesignated land, accompanied with affidavit showing the land to be of the character coming within the purview of the statute:

"Such application, together with the regular fees and commissions, shall be received by the register and receiver of the land district in which said land is located and suspended until it shall have been determined by the Secretary of the Interior whether said land is actually of that character. That during such suspension the land described in the application shall not be disposed of; and if the said land shall be designated under this Act, then such application shall be allowed; otherwise it shall be rejected, subject to appeal; but no right to occupy such lands shall be acquired by reason of said application until said lands have been designated as stock-raising lands."

It is apparent from these provisions of the stock-raising homestead law that until an investigation is made and it is determined by the Secretary of the Interior that the land is of the class covered by the Act, the person seeking such an entry has merely a suspended application with a preference right of entry. The legal title of the land, of course, still remains in the United States, and even the right of possession of the land is specifically denied the applicant

by the statute. Necessarily, no entry is or can be made until the designation of the land as of the proper class takes effect. In the language of the Department of the Interior, "lands can be 'appropriated' under a stock-raising homestead application only when an entry thereunder may be lawfully allowed, and this may not be done in the face of a statute and appropriate regulations providing otherwise." Arthur W. Benhart, 49 L. D. 310.

The Department has also held that:

"One who files an application under the enlarged homestead act or the stock-raising homestead act for a tract of undesignated land can not be charged with claiming the land therein described until the date the application becomes allowable after the designation of the land becomes effective." Isaac P. Palmer, 50 L. D. 3.

In 47 L. D. 630, in discussing the segregative effect of both the enlarged and stock-raising homestead acts relative to cases where such lands duly applied for were, prior to designation, placed within the exterior limits of a national forest reserve, it was remarked that:

"An application for undesignated land, under the enlarged homestead law, is specifically given a segregative effect by the Act of March 4, 1915 (38 St., 1162), while no such provision is found in the stock-raising homestead law or any amendment thereof. That Congress did not intend to recognize any segregative effect to a stock-raising application for undesignated land is shown, not only by the absence of any provision in that law similar to the one referred to in the act of March 4, 1915, supra, but by the prohibition, in Section 2 of the act of December 29, 1916, supra, of the occupation of the land pending designation thereof. The Department has repeatedly held that the right conferred upon the applicant by Section 2 of the stock-raising act, and that created by Section 8 thereof, are mere preference rights, neither of which attaches to the land unless and until designated, and which, when in conflict, are to be determined by the dates of the original claims. Manifestly, therefore, there can be no appropriation, either under Section 2 or Section 8 of the stock-raising

law, prior to designation of the land—in fact such appropriation is forbidden.''

Again, in Blakeman v. Elkins, 48 L. D. 137, distinguishing the decisions as to relinquishments of entries as not applicable to unallowed stock-raising homestead entries, it was said:

''The decisions relating to relinquishments of entries have no application to unallowed and unallowable homestead applications or preference rights, which may be waived, lost or forfeited by formal relinquishment, by failure to assert the right or by conduct inconsistent with good faith; and when such an application or preference right is, in fact, waived, lost or forfeited, it inures to the benefit of the next legal applicant, since a homestead application or a preference right does not segregate the land from the public domain.''

We think it plain, therefore, that while the application to enter a stock-raising homestead is suspended and such entry unallowed, the land embraced therein is not segregated from the body of the public lands of the nation. The situation, consequently, is radically different from that produced where original homestead and other entries of public lands are made. In such cases, the entry becomes a fact immediately upon filing and payment of the necessary fees in the proper federal land office. Possession, too, is forthwith given the entryman and his improvements are either permitted or required to be placed upon the land, which is immediately segregated from the public domain. Hence the decisions relative to obtaining rights of way across entries of this character, under the Act of Congress of March 3, 1875 (18 St. at L. 482), by railroads are not helpful in the instant case. However, as previously mentioned, the similarity of the pipeline right of way act and the railroad right of way law is marked and decisions as to the legal operative effect of the latter are pertinent in construing the former. It is well established that the grant of a railroad

right of way under the Act of March 3, 1875, supra, is a grant *in praesenti,* differing only from an absolute present grant in that the thing granted is indefinite and the name of the grantee unknown. D. & R. G. Ry. Co. v. Alling, 99 U. S. 463, 470, 25 L. Ed. 438; Noble v. Union etc. Co., 147 U. S. 165, 13 Sup. Ct. Rep. 271, 37 L. Ed. 123; Jamestown etc. Co. v. Jones, 177 U. S. 125, 20 Sup. Ct. Rep. 568, 44 L. Ed. 698. The unknown and indefinite elements in the grant are made known and definite upon taking the necessary steps required by the act as construed by the courts. Such grant is also a limited fee upon an implied condition of reverter on failure to use the lands for the purpose stated in the act. Rio Grande Western Ry. Co. v. Stringham, supra. While the two acts of Congress are similar in these respects, it is especially to be observed that the third section of the railroad right of way act makes specific provision for the condemnation of possessory claims upon the public domain when crossed by such right of way; the pipeline right of way statute does not do this.

In Washington etc. R. Co. v. Osborne, 169 U. S. 103, 40 L. Ed. 356, there was considered the right of a railroad company under the right of way act of March 3, 1875, to pass through land which had been previously taken possession of, settled upon, and improved by Osborne under the pre-emption laws, though not patented, without paying him compensation therefor. It was urged on behalf of the company that it was within the doctrine of many decisions of the federal Supreme Court which declares ''that a party, by mere settlement upon the lands of the United States, although with a declared intention to obtain title to the same under the pre-emption laws, does not thereby acquire such a vested interest in the premises as to deprive Congress of the power to divest it by a grant to another party.'' Citing the case of Frisbie v. Whitney, 76 U. S. 187, 19 L. Ed. 668; Hutchings v. Low, 82 U. S. 77, 21 L. Ed. 82, and Buxton v. Traver, 139 U. S. 232, 32 L. Ed. 920. After quoting from the Buxton case, the court remarked:

"It must therefore be conceded that Osborn did not, by maintaining possession for several years and putting valuable improvements thereon, preclude the government from dealing with the lands as its own, and from conferring them on another party by a subsequent grant."

But the court then held that the settler's right to compensation had been saved by the express provision of Section 3 of the Act of March 3, 1875, to which reference has already been made. It would appear, therefore, that there must be settlement and entry in the land office of the United States to defeat a Congressional grant.

Applying these principles to the case at bar, it is clear that the construction of the two pipelines by the defendant in 1918, the right of way maps for which were duly approved by the Secretary of the Interior, in 1918 and 1919 respectively, constituted a grant *in praesenti* from the government to the defendant. The land included, at the time it was so granted, was not even affected by a possessory right on the part of anyone other than the United States. It was then not segregated from the general public domain as it would have been under an ordinary possessory claim entry. Smith could not be construed as even claiming the land. Neither was the land subject to entry by Smith until designation of it as of the proper class had been made by the Secretary of the Interior, an act which occurred after the several grants to the defendant were complete and fixed. The pipeline act making no provision for saving the rights of even possessory claimants through providing for the condemnation thereof, the defendant received its grants to the two later pipeline rights of way, initiated in 1918, free from any obligations to Smith and necessarily to the plaintiff, whose rights attached long after these grants were complete, and then only by virtue of compliance with law after Smith's rights had ceased through his death.

It is said that plaintiff's rights should operate by relation. But as declared by Judge Cooley in Flint, etc. v. Gordon, 2 N. W. 648, the doctrine of relation "can never be so

applied as to make that a wrong which was innocent when done, or so as to divest rights which, by the sanction of law, have been acquired since the time from which the relation dates. Bacon v. Kimmel, 14 Mich. 201, 281; Whipple v. Farrar, 3 Mich. 436; Blackwood v. Brown, 29 Mich. 483.'' To the same effect see Lewis v. Rio Grande etc. Ry. Co., 17 Utah 504, 54 Pac. 981. How can it be said that defendant was guilty of any wrong when it constructed these two 1918 pipelines? The land it went upon to do this was unsegregated public land of the United States, unaffected by any possessory claim, no trespass was committed and no one did or could complain. An act of Congress gave defendant the right to so construct these pipelines. Even if the pipeline act had contained provisions similar to Section 3 of the railroad right of way act, it is not at all clear that the interest of Smith, peculiar as that interest was previous to designation and entry of the land, could have been condemned by the defendant. It certainly could not have been so taken under any law of this state, for Section 4929, W. C. S. 1920, does not give that right. Nor has any act of Congress been drawn to our attention which confers such a power. Was it the intention of Congress that the grant *in praesenti* of a pipeline right of way should be hampered and limited by the necessity of bringing condemnation proceedings after the land had been designated as subject to entry and plaintiff had decided that he would complete the entry previously made by his devisor—a matter of years afterwards? We are not inclined to think so. A construction of the law which leads to such a result would destroy, in large measure, the usefulness of the statute, as we think. Pipelines are built to bring about rapid transit of oil and gas for the increasing commercial needs of the nation. Such lines cannot be built on a sound financial basis unless it can be determined in advance, with reasonable accuracy, what they will cost. Pipeline companies could not very safely put their lines in place in ground which long afterwards

they would be forced to buy from others at condemnation prices at the end of expensive litigation.

It is urged that the stock-raising homestead law declares that while the application to enter is suspended, "the land described in the application shall not be disposed of," and that this clause precludes the granting by the government of a pipeline right of way over the land during that period. There are several answers to this contention, as we view the matter. First, it would appear that the clause last above quoted is simply a prohibition laid upon the proper land officers of the government as regards claims under the stock-raising homestead and kindred laws, but does not undertake to nullify an outright Congressional grant of a right of way. The Department of the Interior has held that land included in and even designated, though not made finally effective, as stock-raising homestead land, must be disposed of otherwise when the director of the geological survey has classified such land as subject to another law, i. e., the oil leasing act. Arthur W. Benhart, 49 L. D. 310. See also 47 L. D. 630.

Again, we are inclined to the view that the grantee of the limited right to use the land for pipeline purposes only, subject to reverter when such use ceases, is not a disposition of the land, within the prohibitory terms of the stock-raising homestead statute. The pipeline act itself uses the same language, viz: "all such lands over which such right of way shall pass shall be disposed of subject to such right of way." As so used, the words "disposed of" undoubtedly contemplate a transfer of the land by the United States, yet one that is not inconsistent with a pre-existent grant of the limited right of way, to be used solely for pipeline purposes. In the case of In re Hubbell, Trustee, 135 Ia. 637, 113 N. W. 512, 13 L. R. A. (N. S.) 496, 14 Ann. Cas. 640, in holding that a ground lease for 99 years was not forbidden by a trust deed which declared that the trustees should not "sell or dispose of" certain real property, the court, citing numerous authorities, said:

"Any transfer of real estate, short of a conveyance of the title, is technically not an alienation of the estate."

In Ross v. Trustees of University, 30 Wyo. 433, 222 Pac. 3, construing language in both Section 8 of the Act of Admission of Wyoming prohibiting the "sale" of certain lands except under certain conditions, and Section 1 of Art. XVIII of Wyoming's Constitution providing for "disposal" of such lands only after appraisal, this court said:

"We think, therefore, that the granting of the right of way across the lands in question was not a sale of the lands within the meaning of the grant nor a disposal thereof within the meaning of the cited section of the state constitution."

So we conclude that the two later pipeline rights of way, initiated in 1918, are also valid as against plaintiff's patent acquired under the stock-raising homestead statute as hereinbefore described. The fact that the patent to the heirs or devisees of Smith contains no reservations as to the several rights of way granted defendant is of no significance. The practice of the Department of the Interior in that respect is fully outlined in West Elk Land & Livestock Co. v. Telck, 45 L. D. 460.

But if we should be mistaken in our views concerning the legal effect of the grant of the two 1918 rights of way, there is yet another reason on that branch of the case why we should not disturb the judgment of the trial court. There is no proof in the record before us of the amount of damage caused plaintiff by the two nine and thirty-seven foot portions of said later rights of way which extended beyond the limits of the first pipeline right of way, the latter initiated and granted long prior to Smith's and plaintiff's connection with the land in question. The proof was as to claimed damage arising from all the asserted rights of way, indiscriminately. The case should not be reversed where at most plaintiff's proof discloses him to be entitled

84

to nominal damages only. Martel v. Hall Oil Co., 36 Wyo. 166, 253 Pac. 862, 255 Pac. 3, 52 A. L. R. 91, and cases there cited.

It results from what has been said that the judgment of the trial court should be and the same is affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.